# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KONINKLIJKE PHILIPS N.V., <br><br> Plaintiff, <br><br> vs. <br><br> QUECTEL WIRELESS SOLUTIONS CO. LTD., <br><br> Defendant. | C.A. No. 20-1707-CFC-CJB <br><br><br> JURY TRIAL DEMANDED |

## JOINT CLAIM CONSTRUCTION BRIEF

YOUNG CONWAY STARGATT & TAYLOR, LLP

Adam W. Poff (No. 3990)
Robert M. Vrana (No. 5666)
Alexis N. Stombaugh (No. 6702)
1000 N. King Street
Wilmington, DE 19801
(302) 571-6600
apoff@ycst.com
rvrana@ycst.com
astombaugh@ycst.com

OF COUNSEL:

Eley O. Thompson (*pro hac vice*)
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
(312) 832-4359
ethompson@foley.com

Kevin M. Littman (*pro hac vice*)
Lucas I. Silva (*pro hac vice*)

FISH & RICHARDSON P.C.

Warren K. Mabey, Jr. (No. 5775)
Martina Tyreus Hufnal (No. 4771)
222 Delaware Avenue, 17th Floor
Wilmington, DE 19899
Tel: (302) 652-5070
Fax: (302) 652-0607
mabey@fr.com
hufnal@fr.com

Thomas H. Reger II (pro hac vice)
Fish & Richardson P.C.
1717 Main Street, Suite 5000
Dallas, Texas 75201
(214) 747-5070 (Telephone)
(214) 747-2091 (Facsimile)
reger@fr.com

Lawrence R. Jarvis (pro hac vice)
Katherine Reardon (pro hac vice)
Fish & Richardson P.C.
1180 Peachtree Street NE

FOLEY & LARDNER LLP
111 Huntington Avenue
Suite 2500
Boston, MA 02199-7610
(617) 342-4000
klittman@foley.com
lsilva@foley.com

Alexis K. Juergens (pro hac vice)
Foley & Lardner LLP
95 S. State Street
Suite 2500
Salt Lake City, UT 84111
ajuergens@foley.com

*Attorneys for Plaintiff Koninklijke Philips N.V.*

21st floor
Atlanta, GA 30309
(404) 892-5005
jarvis@fr.com
reardon@fr.com

Elizabeth G.H. Ranks (pro hac vice)
Fish & Richardson P.C.
One Marina Park Drive
Suite 1700
Boston, MA 02210
617-368-2175
ranks@fr.com

Bryan J. Cannon (pro hac vice)
Fish & Richardson P.C.
1000 Maine Avenue SW
Suite 1000
Washington, DC 20024
(202) 220-6859
cannon@fr.com

*Attorneys for Defendant Quectel Wireless Solutions Co. Ltd.*

Dated: January 23, 2026

**TABLE OF CONTENTS**

**Page**

I.  AGREED-UPON CONSTRUCTIONS........................................................1

    A.  U.S. Patent No. 8,195,216 (the "'216 Patent") ......................................1

    B.  U.S. Patent No. 7,089,028 (the "'028 Patent") ....................................1

    C.  U.S. Patent No. 9,178,577 (the "'577 Patent") .....................................1

    D.  U.S. Patent No. 9,635,599 (the "'599 Patent") .....................................1

II.  INTRODUCTION ...................................................................................2

    A.  Quectel's Answering Position...............................................................2

III.  '028 PATENT...........................................................................................2

    A.  Background .............................................................................................2

        1.  Quectel's Answering Position....................................................2

    B.  Disputed Constructions of the '028 Patent............................................3

        1.  "means for transmitting a request for resources to a primary station" / "means for receiving an acknowledgment of a reception of the request for resources by the primary station" ('028 Patent, claim 11) .........3

            a.  Philips's Opening Position ...............................................3

            b.  Quectel's Answering Position ........................................11

                i.  Philips Excludes the Actual Structure Performing the Claimed Function........................11

                ii.  Philips's Reliance on *Asyst* is Inapposite and Irrelevant ............................................................14

            c.  Philips's Reply Position..................................................16

            d.  Quectel's Sur-Reply Position .........................................18

i

2. "power control means" ..................................................20

    a. Philips's Opening Position ...........................................20

        i. "Power Control Means" Is Not Subject To § 112, ¶ 6. .....................................................20

        ii. Quectel Improperly Includes a Transceiver and Antenna as Corresponding Structure to the "Power Control Means." ...............................24

    b. Quectel's Answering Position ......................................25

        i. Philips Fails to Overcome the Presumption that Section 112 ¶ 6 Applies................................26

        ii. Philips's Proposed Construction is Incomplete .........................................................28

    c. Philips's Reply Position.................................................30

        i. "Power Control Means" Is Not Subject To § 112, ¶ 6 ................................................30

        ii. Quectel Improperly Includes a Transceiver and Antenna as Corresponding Structure to the "Power Control Means" ...............................32

    d. Quectel's Sur-Reply Position ......................................36

3. "control channel" .......................................................38

    a. Philips's Opening Position ...........................................38

    b. Quectel's Answering Position ......................................41

    c. Philips's Reply Position.................................................43

    d. Quectel's Sur-Reply Position ......................................46

4. "subsequent to a reception of the acknowledgement by the secondary station, control information is initially transmitted on an uplink control channel and a downlink

control channel between the primary station and said secondary station"........................................................46

      a.     Philips's Opening Position ................................47

      b.     Quectel's Answering Position .........................48

   5.    "determinedly delay" ('028 Patent, claim 11) ..........................49

      a.     Quectel's Answering Position .........................49

      b.     Philips's Reply Position...................................51

      c.     Quectel's Sur-Reply Position .........................54

IV.   '216 PATENT....................................................................55

   A.   Background ....................................................................55

      1.    Quectel's Answering Position.......................................55

   B.   Disputed Constructions of the '216 Patent............................55

      1.    "power control means for adjusting the power of the uplink control and data channels in response to the downlink power control commands" ('216 Patent, claim 13) .............................................................................55

         a.     Philips's Opening Position ................................56

            i.     "Power Control Means" Is Not Subject To § 112, ¶ 6. ................................56

            ii.    Quectel Improperly Includes a Transceiver and Antenna as Corresponding Structure to the "Power Control Means." ................................56

         b.     Quectel's Answering Position .........................57

          c.     Philips's Reply Position...................................57

         d.     Quectel's Sur-Reply Position .........................58

2.    "means for setting an initial transmission power after an interruption in transmission to that before the interruption adjusted by an offset" ('216 Patent, claim 13) ........................59

    a.    Philips's Opening Position ..............................................59

    b.    Quectel's Answering Position ........................................62

    c.    Philips's Reply Position..................................................64

    d.    Quectel's Sur-Reply Position .........................................67

3.    "means for determining the offset from a weighted sum of power control commands in accordance with an equation …" ('216 Patent, claim 13).......................................................68

    a.    Philips's Opening Position ..............................................68

    b.    Quectel's Answering Position ........................................69

    c.    Philips's Reply Position..................................................72

        i.    The Term Is a Single Means-Plus-Function Limitation ..........................................................72

        ii.    Quectel's Indefiniteness Arguments Are Improper ...............................................................74

    d.    Quectel's Sur-Reply Position .........................................75

4.    "[and in that] means are provided for quantizing the offset…" ('216 Patent, claim 13)..............................................77

    a.    Philips's Opening Position ..............................................77

    b.    Quectel's Answering Position ........................................77

    c.    Philips's Reply Position..................................................79

        i.    The Full "Means for Determining …" Limitation Is a Single Means-Plus-Function Limitation ..........................................................79

ii.    Quectel's Indefiniteness Arguments Are Improper ................................................................79

d.    Quectel's Sur-Reply Position .........................................79

5.    "interruption in transmission" ('216 Patent, claim 13).............80

a.    Philips's Opening Position .............................................80

b.    Quectel's Answering Position ........................................82

i.    Philips Mischaracterizes the '216 Patent's IPR ....................................................................82

ii.    Quectel's Proposed Construction Aligns with the Intrinsic Record .............................................84

c.    Philips's Reply Position..................................................85

d.    Quectel's Sur-Reply Position .........................................87

6.    "downlink power control commands" ......................................87

a.    Philips's Opening Position .............................................87

b.    Quectel's Answering Position ........................................88

V.    '577/'599 PATENTS ..............................................................................88

A.    Background ...........................................................................................88

1.    Quectel's Answering Position........................................................88

B.    Disputed Constructions of the '599/'577 Patents ...............................88

1.    "number of simultaneous data streams that the secondary station is capable of receiving"/ "a number of simultaneous data streams that the secondary station is capable of receiving or processing." ('577 Patent, claim 17; '599 Patent, claim 33)..........................................88

a.    Philips's Opening Position .............................................89

b.    Quectel's Answering Position ........................................90

      c.     Philips's Reply Position...................................................95

      d.     Quectel's Sur-Reply Position ........................................98

VI.   CONCLUSION.................................................................................99

   A.     Philips's Opening Position ...................................................99

   B.     Quectel's Answering Position..............................................99

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*,
521 F.3d 1328 (Fed. Cir. 2008) ............................................................71

*Asyst Techs., Inc. v. Empak, Inc.*,
268 F.3d 1364 (Fed. Cir. 2001) ......................................................*passim*

*Aylus Networks, Inc. v. Apple, Inc.*,
856 F.3d 1353 (Fed. Cir. 2017) .....................................................*passim*

*B. Braun Med., Inc. v. Abbott Lab'ys*,
124 F.3d 1419 (Fed. Cir. 1997) .......................................................8, 24

*Biomedino, LLC v. Waters Techs. Corp.*,
490 F.3d 946 (Fed. Cir. 2007) ........................................................28, 32

*Comput. Docking Station Corp. v. Dell, Inc.*,
519 F.3d 1366 (Fed. Cir. 2008) ............................................................96

*Comtech EF Data Corp. v. Radyne Corp.*,
No. CV-06-1132-PHXMHM, 2007 WL 5041159 (D. Ariz. Oct. 12,
2007) ...............................................................................................23, 24

*Data Engine Techs. LLC v. Google, LLC*,
10 F.4th 1375 (Fed. Cir. 2021) .............................................50, 59, 70

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
469 F.3d 1005 (Fed. Cir. 2006) ...........................................................78

*Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*,
899 F.3d 1291 (Fed. Cir. 2018) .....................................................26, 78

*Enercon GmbH v. Int'l Trade Comm'n*,
151 F.3d 1376 (Fed. Cir. 1998) ...........................................................89

*EnOcean GmbH v. Face Int'l Corp.*,
742 F.3d 955 (Fed. Cir. 2014) ......................................................57, 69

*Friskit, Inc. v. Real Networks, Inc.*,
    306 Fed. Appx. 610 (Fed. Cir. 2009)................................................................39

*Gemalto S.A. v. HTC Corp.*,
    754 F.3d 1364 (Fed. Cir. 2014) ........................................................................91

*Genuine Enabling Tech. LLC v. Sony Corp.*,
    No. 17-cv-135, 2024 WL 1255513 (D. Del. Mar. 25, 2024)..............................71

*HTC Corp. v. IPCom GmbH & Co., KG*,
    667 F.3d 1270 (Fed. Cir. 2012) .....................................................................7, 33

*Int'l Rectifier Corp. v. IXYS Corp.*,
    361 F.3d 1363 (Fed. Cir. 2004) ........................................................................94

*INVISTA N. Am. S.a.r.l. v. M & G USA Corp.*,
    951 F. Supp. 2d 604 (D. Del. 2013)..................................................................64

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
    688 F.3d 1342 (Fed. Cir. 2012) ........................................................................47

*Koki Holdings Co. v. Kyocera Senco Indus. Tools, Inc.*,
    No. 18-313-CFC, 2021 WL 1092579 (D. Del. Mar. 22, 2021)..........................15

*Laitram Corp. v. NEC Corp.*,
    163 F.3d 1342 (Fed. Cir. 1998) ........................................................................89

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
    790 F.3d 1329 (Fed. Cir. 2015) ..................................................23, 24, 27, 31

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
    498 F. Appx. 986 (Fed. Cir. 2013) ..............................................................28, 31

*Lowe v. ShieldMark, Inc.*,
    No. 2021-2164, 2022 WL 636100 (Fed. Cir. Mar. 4, 2022) ..............................40

*LSI Indus., Inc. v. ImagePoint, Inc.*,
    279 F. App'x 964 (Fed. Cir. 2008) (*nonprecedential*) ......................................21

*Masimo Corp. v. Philips Elecs. North Am. Corp.*,
    No. 09–80–LPS–MPT, 2011 WL 678447 (D. Del. Feb. 18, 2011) ...................34

*Masimo Corp. v. Sotera Wireless, Inc.*,
   No. 2022-1393, 2023 WL 6990542 (Fed. Cir. Oct. 24, 2023) ..........................21

*Mass. Inst. of Tech. and Elecs. for Imaging, Inc. v. Abacus Software*,
   462 F.3d 1344 (Fed. Cir. 2006) .......................................................21

*N. Atl. Imports, LLC v. LoCo-Crazy Good Cookers, Inc.*,
   No. 23-999-GBW-SRF, 2025 WL 47984 (D. Del. Jan. 8, 2025)......................47

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008) .......................................................90

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003) ..........................................29, 64, 95

*ON Semiconductor Corp. v. Power Integrations, Inc.*,
   No. 17-247-LPS-CJB, 2018 WL 4905591 (D. Del. Oct. 9, 2018) ....................86

*Philips v. HP*,
   C.A. No. 20-cv-1241-CFC.............................................................70, 77

*Qualcomm Inc. v. Intel Corp.*,
   6 F.4th 1256 (Fed. Cir. 2021) .......................................................10, 61

*Quectel Wireless Sols. Co. Ltd. v. Koninklijke Philips N.V.*,
   No. IPR2021-00563, 2022 WL 4280566 (P.T.A.B. Sept. 13, 2022) ..........*passim*

*Quectel Wireless Sols. Co. Ltd. v. Philips*,
   No. IPR2021-00560, 2022 WL 4112074 (P.T.A.B. Sept. 8, 2022) ..................47

*Quectel Wireless Sols. Co. v. Koninklijke Philips N.V.*,
   No. 2023-1155, 2024 WL 2064617 (Fed. Cir. May 9, 2024)............................47

*Salazar v. Procter & Gamble Co.*,
   414 F.3d 1342 (Fed. Cir. 2005) .......................................................97

*Shire Development, LLC v. Watson Pharms., Inc.*,
   787 F.3d 1359 (Fed. Cir. 2015) .......................................................42

*Sisvel Int'l S.A. v. Sierra Wireless, Inc.*,
   82 F.4th 1355 (Fed. Cir. 2023) .......................................................60

*Smith Int'l, Inc. v. Baker Hughes Inc.*,
   No. 16-56-ECR, 2018 WL 3381299 (D. Del. July 11, 2018)..............................34

*St. Clair Intell. Prop. Consultants, Inc. v. Apple. Inc.*,
   No. 10-982-LPS, 2012 WL 3238252 (D. Del. Aug. 7, 2012) ...........................19

*St. Clair Intell. Prop. Consultants v. Toshiba Corp.*,
   2015 WL 865474 (D. Del. Feb. 25, 2015)...................................................27, 30

*TecSec, Inc. v. Int'l Bus. Machines Corp.*,
   731 F.3d 1336 (Fed. Cir. 2013) ......................................................................21

*Thorner v. Sony Comput. Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) ......................................................................40

*Uniloc USA, Inc. v. AVG Techs. USA, Inc.*,
   No. 2:16-CV-00393-RWS, 2017 WL 1154927 (E.D. Tex. Mar. 28,
   2017) ..............................................................................................................28

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*,
   239 F.3d 1225 (Fed. Cir. 2001) ......................................................................33

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) ........................................................13, 20, 26

*WSOU Investments LLC v. Google LLC*,
   No. 2022-1064, 2023 WL 6531525 (Fed. Cir. Oct. 6, 2023) .............29, 33, 72

## STATUTES

35 U.S.C. 112 .........................................................................4, 10, 25, 68

x

## I.    AGREED-UPON CONSTRUCTIONS

### A.    U.S. Patent No. 8,195,216 (the "'216 Patent")

| '216 Patent ||
|---|---|
| **Term** | **Parties' Agreed Construction** |
| "primary station" (Claim 13) | "base station" |

### B.    U.S. Patent No. 7,089,028 (the "'028 Patent")

| '028 Patent ||
|---|---|
| **Term** | **Parties' Agreed Construction** |
| "primary station" (Claim 11) | "base station" |

### C.    U.S. Patent No. 9,178,577 (the "'577 Patent")

| '577 Patent ||
|---|---|
| **Term** | **Parties' Agreed Construction** |
| "data packets" (claim 17) | "a unit of communication including a header and a payload, where the payload is data for transmission, and the header includes protocol information for the payload." |
| "primary station" (claims 17, 19) | "base station" |

### D.    U.S. Patent No. 9,635,599 (the "'599 Patent")

| '599 Patent ||
|---|---|
| **Term** | **Parties' Agreed Construction** |
| "data packets" (claims 33, 34, 35, 36, 38, 39) | "a unit of communication including a header and a payload, where the payload is data for transmission, and the header includes protocol information for the payload." |
| "primary station" (claims 33, 35) | "base station" |

1

## II.    INTRODUCTION

### A.    Quectel's Answering Position

Philips tries to improperly stretch its asserted patents to find infringement.

Philips's broad unsupported proposed constructions for the disputed terms are thus

driven not by the intrinsic record.  Quectel's proposed constructions, by contrast,

are supported by and align with the claim language, the specifications, Philips's

own representations to the PTAB during IPR proceedings, and the understanding

of a POSITA at the time of the purported invention.  For the reasons set forth

below, Quectel respectfully requests that the Court adopt Quectel's proposed

constructions.

## III.    '028 PATENT

### A.    Background

#### 1.    Quectel's Answering Position

The '028 Patent describes "a radio communication system that can operate

in a frequency division duplex mode" "using spread spectrum Code Division

Multiple Access (CDMA) techniques."  '028 Patent, 3:3-4, 6:45-48; *see* Ex. 4 (Min

Decl.), ¶¶ 26-30.  The '028 Patent explains that "[t]here are two basic types of

communication required between a Base Station (BS) and a Mobile Station (MS)[;

t]he first is user traffic, for example speech or packet data," and "[t]he second is

control information, required to set and monitor various parameters of the

transmission channel to enable the BS and MS to exchange the required user

2

traffic." *Id.*, 1:11-17. The '028 Patent acknowledges that "[i]n many communication systems one of the functions of the control information is to enable power control," which "is normally operated in a closed loop manner." *Id.*, 1:18-31.

The '028 Patent states that "data transmissions at the start of the data channel 210 are likely to be received in a corrupted state if they are transmitted at too low a power level, or to generate extra interference if they are transmitted at too high a power level." *Id.*, 3:46-50. The '028 Patent tries to solve this potential problem by delaying "the start of the uplink data transmission 210 … by a time 302 sufficient for the power control to have converged sufficiently to enable satisfactory reception of data transmissions by the BS." *Id.*, 3:58-62.

### B.    Disputed Constructions of the '028 Patent

1.    **"means for transmitting a request for resources to a primary station" / "means for receiving an acknowledgment of a reception of the request for resources by the primary station" ('028 Patent, claim 11)**

a.    Philips's Opening Position

These terms are means-plus-function terms under 35 U.S.C. 112, ¶ 6. They are briefed together because the disputes are the same.

**"Means for Transmitting"**:

3

For "means for transmitting," the parties agree the function is: "[a] secondary station, comprising: means for **transmitting a request for resources to a primary station**."

The parties' dispute is about corresponding structure. The structure, a transceiver, is clearly identified in the specification:

> Referring to FIG. 1, a radio communication system
> …
> Each MS 110 comprises a microcontroller (pC) 112, **transceiver means (Tx/Rx) 114** connected to antenna means 116, and power control means (PC) 118 for altering the transmitted power level.

('028 Patent, 3:3–17[1].)

---

[1] Per the Court's requirements (D.I. 36, ¶15), text-searchable versions of the Asserted Patents at issue are attached to the parties' Joint Claim Construction Chart (D.I. 90).  Emphasis added unless otherwise specified.



FIG. 1

(*Id.*, Fig. 1.)

The specification also describes the "transceiver means (Tx/Rx) 114" in connection with the function:

> Communication from BS 100 to MS 110 takes place on a downlink frequency channel 122, while **communication from MS 110 to BS 100 takes place on an uplink frequency channel 124**.

(*Id.*, 3:14–17.)

5

**"Means for Receiving"**:

For "means for receiving," the parties agree the function is: "receiving an acknowledgment of a reception of the request for resources by the primary station."

The parties' dispute is about structure. The corresponding structure is again a transceiver. It is clearly identified in the specification, as described above, which describes the "transceiver means (Tx/Rx) 114" in connection with that function, and further confirms that:

> **Communication from BS 100 to MS 110 takes place on a downlink frequency channel 122**, while communication from MS 110 to BS 100 takes place on an uplink frequency channel 124.

(*Id.*, 3:14–17.)

**Further on Structure of "Means for Transmitting" and "Means for Receiving":**

Figure 1 also further illustrates how transceiver (114) both transmits and receives data via the uplink channel (124) and downlink channel (122) between the secondary station and the primary station:

6



FIG. 1

(*Id.*, Fig. 1.)

A person skilled in the art ("POSITA") would recognize that communication between a primary and secondary station is handled by a transceiver and thus interpret "transceiver means" in the specification as referring to a transceiver.[2] (Ex. 1 (Lanning Decl.), ¶¶47-48.) Moreover, even without the specification naming "transceiver means," a POSITA would know the device performing those functions is a transceiver. *Id.*; *HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1278–79 (Fed. Cir. 2012) ("Although the specification

---

[2] The terms "transceiver" and "transceiver/receiver" and "Tx/Rx" are all synonymous. (Ex. 1 (Lanning Decl.), ¶48.)

7

does not literally disclose a processor and transceiver, the district court stated that it had 'no doubt that one skilled in the art would immediately deduce that a processor with a transceiver was the structure indicated by the term'").

**Quectel's Proposal of Adding Additional Structure (for Both Terms) of an Antenna Is Wrong**:

Quectel incorrectly contends that in addition to the transceiver, there is an additional structure of an "antenna 116" in both terms. Quectel is wrong to include that connection as part of the structure.

The specification identifies "transceiver means (Tx/Rx) 114" as the structure in the mobile station responsible for both "transmitting a request for resources to a primary station" and "receiving an acknowledgment of a reception of the request for resources by the primary station." ('028 Patent, 3:11–12.) No further structure is described or necessary. *B. Braun Med., Inc. v. Abbott Lab'ys*, 124 F.3d 1419, 1424 (Fed. Cir. 1997) ("structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.").

While the transceiver is "connected to antenna means 116" ('028 Patent, 3:12), the specification recognizes that the transceiver means 114 is separate from the antenna means 116 (*id.*, Fig. 1, 3:3–17). They are separate structures. The transceiver's role is to generate radio frequency signals from electrical signals and to extract electrical signals from received radio signals, while the antenna is a

passive device that propagates electromagnetic waves through the air. (Ex. 1 (Lanning Decl.), ¶¶49-50.) The patent is clear that it is the transceiver that performs the recited functions, not the passive antenna. The antenna's role in interfacing with the environment does not make it proper to include it as part of the structure any more than including the air through which the waves travel.

In *Asyst Technologies, Inc. v. Empak, Inc.*, for example, the Federal Circuit found that the district court erred in construing the corresponding structure for "microcomputer means for receiving and processing digital information communicated with said respective … two-way communication means" to include the computer and the connecting wire. 268 F.3d 1364, 1367, 1370 (Fed. Cir. 2001). The Federal Circuit found that the limitation recited two functions, receiving and processing data. *Id.* at 1370-71. While it was true that the connecting wire enabled the computer to perform the named functions because it "carries or communicates information between the…communication means," the Federal Circuit held that the corresponding structure must actually perform the function of "receiving…." *Id.* To illustrate the point, the court analogized: "An electrical outlet enables a toaster to work, but the outlet is not for that reason considered part of the toaster." *Id.* at 1371. It is not enough that a structure "enable the pertinent structure to operate as intended." *Id.*

9

At most, the antenna 116 enables the transceiver to perform its functions of transmitting and receiving. Other structures do so as well, such as the air (which is analogous to the wire in *Asyst*) and the battery or other power source in the mobile station. The antenna does not, however, actually perform those functions. The corresponding structure should be limited to a transceiver.

**Quectel's Proposal of the Structure Including an Algorithm is Wrong**:

Quectel also attempts to insert "the corresponding description of the algorithm at '028 Patent at 3:3-12" into the structure. Quectel's proposed construction of the corresponding structure is wrong.

The transceiver requires no accompanying algorithm to satisfy 35 U.S.C. 112, ¶ 6. "[O]ur case law 'does not require a specific algorithm when the identified structure is not a general-purpose computer or processor.'" *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256, 1266 (Fed. Cir. 2021). A transceiver is circuitry, and the Federal Circuit has refused to extend the algorithmic support requirement for general purpose computers to circuitry. "Circuitry [] provides structure that necessarily limits the scope of a claim without the aid of special programming." *Id.* at 1267.

Moreover, it is unclear what "algorithm" Quectel is referring to at column 3:3-12. That portion of the specification describes the various elements in Figure 1. It is not an algorithm.

10

b.      Quectel's Answering Position

The parties agree that these terms invoke Section 112 ¶ 6, the first term's function is "transmitting a request for resources to a primary station," and the second term's function is the "receiving an acknowledgment of a reception of the request for resources by the primary station."[3]  The primary dispute is whether the required structure includes an antenna 116 for accomplishing the agreed-to function.  Contrary to the law, the patent, and what a POSITA would understand, Philips proposes a standalone transceiver/receiver as the corresponding structure.  *See* Ex. 4 (Min Decl.), ¶¶ 51-60, 63-72.

                              i.      <u>Philips Excludes the Actual Structure Performing the Claimed Function</u>

The law requires identifying the disclosed structure that performs the claimed functions of "**transmitting**" and "**receiving**" requests and acknowledgements to and from a primary station.  Here, the intrinsic evidence demonstrates the antenna is required to perform those claimed functions.  The specification expressly provides that "the MS 110 transmit[s] a request 202 (REQ) for resources on the uplink channel 124," and that "[e]ach MS 110 comprises a

---

[3] In the Joint Claim Construction Chart, Philips identified "secondary station" as part of the functional language of the "means for receiving" term.  D.I. 90-2 at 8. Philips's opening claim construction brief, however, indicates agreement with Quectel on the functional language aspect of this term.  (*See supra*, pp. 4-5.).  To the extent a dispute remains about the inclusion of "secondary station," Quectel maintains this language is not functional and need not be included.

11

microcontroller (µC) 112, **transceiver means (Tx/Rx) 114 connected to antenna means 116**, and power control means (PC) 118." '028 Patent, 3:11-13; 3:21-22. These disclosures illustrate that Philips's truncation of "transceiver means [ ] (Tx/Rx) … connected to antenna" to just a standalone transceiver/receiver is arbitrary and incorrect. *Id.*

Fig. 1—as annotated by Quectel's IPR expert Dr. Zhi Ding—is illustrative. The transceiver 114 is not only physically "connected to" the antenna 116 structurally—it relies on the antenna for signal transmission and reception. That is, the transceiver/receiver is incapable of performing the claimed function absent the antenna to which it is connected. *See* Ex. 4 (Min Decl.), ¶¶ 51-60, 63-72. These are not unrelated "separate structures" as Philips contends. (*Supra*, p. 8.).



FIG. 1

12

Ex. 5 (IPR2021-00560, Ex. 1003 (Ding Decl.)) at 27, 29 (showing the antenna 116, highlighted in red in the original, that performs the claimed function).

Trying to avoid the required antenna, Philips conflates signal transmission and reception with signal generation and extraction: "[t]he **transceiver's role is to generate radio frequency signals** from electrical signals **and to extract signals** from received radio signals." (*Supra*, pp. 8-9.) (citing Ex. 1 (Lanning Decl.), ¶¶ 49-50)).[4]  Missing is any explanation of how a standalone transceiver/receiver actually performs the claimed functions of "transmitting" and "receiving" radio signals, which is insufficient under controlling Federal Circuit law.  *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1352-53 (Fed. Cir. 2015) ("[e]ven if the specification discloses corresponding structure, the disclosure must be of **'adequate' corresponding structure to achieve the claimed function**").

At best, Philips's proposed corresponding structure performs a secondary function of "generat[ing] radio frequency signals" **before** transmission to the primary station and "extract[ing] signals from received radio signals" **after** the secondary station receives signals therefrom.  (*Supra*, pp. 8-9.).  But the intrinsic evidence plainly shows that a standalone transceiver/receiver cannot actually transmit and receive signals to and from a primary station.  *See* Ex. 4 (Min Decl.),

---

[4] Indeed, Philips and its expert agree that an antenna is a device that propagates (i.e., transmits) waves through the air. *Id*.

13

¶¶ 52-60, 64-72.  A POSITA would understand that the antenna is necessary to transmit and receive signals at the secondary station as claimed.  *See id.*, 51-60, 63-72.  As such, Philips's proposed construction improperly excludes the very component that performs the actual claimed function.

> ii.    Philips's Reliance on *Asyst* is Inapposite and Irrelevant

Philips incorrectly cites *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364 (Fed. Cir. 2001) to advance an argument by analogy.  Philips's reliance on *Asyst* is misplaced.

First, unlike here, the district court's construction of "microcomputer means for receiving and processing digital information communicated with said respective … two-way communication means" in *Asyst* to include the computer and connecting wire was unsupported by the asserted patents.  268 F.3d at 1367, 1369; *see also* U.S. Patent Nos. 4,974,166; 5,097,421.  Neither "connecting wire" nor "wire" appears anywhere within the four corners of *Asyst*'s asserted patents.  Here, the '028 Patent's specification precisely discloses that "[e]ach MS 110 comprises," *inter alia*, a "**transceiver means (Tx/Rx) 114 connected to antenna means 116**."  '028 Patent, 3:11-12.  *Asyst* is inapposite because the analysis focused on whether adding a nondisclosed structure to the means-plus-function term was proper.  Not so here.

14

Second, Philips's argument equating air to *Asyst*'s wire is a strawman argument. (*See supra*, pp. 8-10.). Quectel is not proposing to add air—a component clearly not within the "secondary station" defined in claim 11—to the structure of this term. Further, the Federal Circuit noted that a toaster would not work but for an electrical outlet, but "the outlet is not for that reason considered part of the toaster," as Philips cites. *Id.*, 9 (citing *Asyst*, 268 F.3d at 1371). If anything, the electrical outlet is the transceiver/receiver, not the antenna.[5] Quectel agrees that not every but for cause comprises the corresponding structure. But "[t]he transceiver's role is to generate radio frequency signals from electrical signals and to extract electrical signals from received radio signals" by Philips's own admission, **not** "transmitting" or "receiving" them. (*Supra*, pp. 8-9.). Quectel's proposed structure points to specific hardware components **actually** performing the claimed function.

---

[5] Philips's proposed structure renders this claim indefinite and/or lacking enablement. A standalone transceiver/receiver cannot perform the claimed function without an antenna. *See Koki Holdings Co. v. Kyocera Senco Indus. Tools, Inc.*, No. 18-313-CFC, 2021 WL 1092579, at *1 (D. Del. Mar. 22, 2021) ("A claim that is nonsensical or requires an impossibility is indefinite as a matter of law under §112(b).") (citing *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1366-67 (Fed. Cir. 2021)). This contravenes the canon that terms must be construed to preserve validity.

c.      Philips's Reply Position

This term's construction hinges on where to draw the line for corresponding structure: both sides pointed to a transceiver, while Quectel added an antenna.

Quectel's argument for including an antenna rests on at least two flawed arguments: (1) an incorrect argument that the intrinsic evidence "demonstrates the antenna is required to perform those claimed functions," and (2) a misrepresentation of Philips's explanation of how a transceiver operates. (*Supra*, pp.11-15.)

As to the first, the specification does disclose a transceiver "***connected***" to an antenna. ('028 Patent, 3:3-17.) But reading this as a teaching that antennas are what "transmit" and "receive" signals is a strained interpretation.[6]

Both Philips's and Quectel's experts agree that a transceiver does generate RF signals and extract electrical ones—but Quectel ignores the key fact: it also *transmits* those RF signals to an antenna for radiation into the air. (Ex. 1 (Lanning Decl.), ¶¶49-50; Ex. 4 (Min Decl.), ¶57.) The antenna simply acts as a medium between the transceiver and the air through which the signals radiate. (Ex. 1 (Lanning Decl.), ¶¶49-50.) Again, the Federal Circuit does not require ***enabling*** devices to be the corresponding structure. *Asyst*, 268 F.3d at 1367, 1371.

---

[6] Quectel's reliance on Dr. Ding's reproduction, in the IPR, of Figure 1 from the patent showing merely that ***connection*** between antenna 116 and transceiver 114, just as there are other connections in the figure, adds nothing to the analysis.

16

Quectel misreads *Asyst*. The district court in *Asyst* found that the connecting "wire" was corresponding structure (*Asyst*, 268 F.3d at 1369), and Quectel is correct that "wire" is not found in the specification of the patent in *Asyst*. However, the district court also held that "the equivalent of such a wire" was part of the corresponding structure. *Id*. The Federal Circuit recognized this and performed its analysis with respect to the "line 51" that is identified in the specification. *Id*. at 1369-71. The interchangeable use of "wire" and "line" demonstrates that the decision is directly on point.

Second, as to Quectel's misrepresentation of how a transceiver operates, Philips and its expert plainly explained that a transceiver performs the function of transmitting and receiving signals. (Ex. 1 (Lanning Decl.), ¶48.) In fact, a transceiver is a two-in-one device, as the name itself demonstrates. (*Id.*; *see also* '028 Patent, Fig. 1 (labeling transceiver 114 as "Tx/Rx").) It is both ***transmitter*** ("trans" or "Tx") and ***receiver*** ("ceiver" or "Rx"), combined. (*Id.*) Quectel's argument that a transceiver does not transmit or receive is as nonsensical as saying a transmitter does not transmit and a receiver does not receive.

Finally, by failing to address Philips's opening argument, Quectel also effectively concedes that no algorithm is required for the transceiver.

17

d.    Quectel's Sur-Reply Position

Philips departs from the technical reality of wireless communication systems requiring **both** components for processing signals (i.e., transceiver) and for propagating/receiving them (i.e., antenna) **to/from the primary station**.  Contrary to Philips's assertion that Dr. Ding's annotation of Figure 1—highlighting the physical connection between an antenna and a transceiver—"adds nothing to the analysis," (s*ee supra*, p. 16), a POSITA would understand that a standalone transceiver cannot comprise the corresponding structure.  *See* Ex. 4 (Min Decl.) ¶¶ 49-72.  Philips's argument that the transceiver "*transmits* those RF signals **to an antenna,**" (*supra*, p. 16.), are irrelevant; this claim requires transmitting to/receiving from **the primary station**.  Indeed, Philips did not dispute that an antenna is necessary structure for this limitation in the IPR proceedings.  *See* Ex. 24 (IPR2021-00560: Paper 2) at 6-10; Ex. 25 (IPR2021-00560: Paper 10) at 15 ("Patent Owner does not dispute Petitioner's identification of corresponding structure" for these terms).  Philips offers no reason for why it has changed its position.

In *SoftView LLC v. Apple Inc.*, the Court determined that the corresponding structure for "wireless communication[s] means" is "an antenna."  No. 10-389, 2013 WL 4758195, at *15 (D. Del. Sept. 4, 2013).  Central to this construction was expert opinion that "**wireless communications are accomplished using antennas,**

18

and it seems unlikely that the external antenna would serve any other purpose" and "**without the antenna, wireless communication would not be possible**." *Id.* at *13. Likewise, cellular communication patents in *Traxcell Techs., LLC v. Sprint Commc'ns Co. LP*, recite a similar structural relationship where transceivers are "coupled" to antennas. 15 F.4th 1121, 1125-27 (Fed. Cir. 2021); *see also Sipco LLC v. Toro Co.*, No. 08-0505, 2009 WL 330969, at *15 (E.D. Pa. Feb. 11, 2009) ("'wireless communication means' is: 'a **wireless RF transceiver** 135 … [and] **an antenna** 225 and equivalents of these structures."). This is the technological reality which Philips brushes aside as "nonsensical," despite not disputing it in the IPR. (*Supra*, p. 17.).

Philips's reliance on *Asyst Techs., Inc. v. Empak, Inc.* remains inapposite. *Asyst* held that "corresponding structure to a function set forth in a means-plus-function limitation must actually perform the recited function, not merely enable the pertinent structure to operate as intended." 268 F.3d at 1371. The corresponding structure must include all necessary components to perform the function of "transmitting" and "receiving" signals to/from the primary station. *See St. Clair Intell. Prop. Consultants, Inc. v. Apple. Inc.*, No. 10-982-LPS, 2012 WL 3238252, at *12 (D. Del. Aug. 7, 2012), (rejecting a construction because the "proposed structure **does not disclose all of the components necessary to perform the function**.").

19

Antennas—unlike wires carrying electrical currents between components within a device—are not passive enabling structures.  Rather, they convert a secondary station's electrical signals into propagatable electromagnetic waves and vice versa to communicate **with other antennas**, as Figure 1 expressly depicts. *See* Ex. 4 ¶¶ 52-60, 64-72.  Transceivers "generat[e] radio frequency signals" **before** transmission to a primary station and "extract[ ] signals from received radio signals" **after** receiving them, but cannot actually transmit or receive signals to the primary station without the antenna.  (*Supra*, pp. 8-9.); Ex. 4 ¶¶ 52-60, 64-72.  If standalone transceivers could perform the claimed functions as Philips contends, the specification's antenna disclosures—including Figure 1—serve no purpose. *See SoftView*, 2013 WL 4758195, at *13.

## 2.    "power control means"

### a.    Philips's Opening Position

#### i.    "Power Control Means" Is Not Subject To § 112, ¶ 6.

The "power control means" limitation is not subject to § 112, ¶ 6. While the use of the term "means" in a claim triggers a presumption that § 112, ¶ 6 applies, "the essential inquiry is not merely the presence or absence of the word 'means' but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Williamson*, 792 F.3d at 1348. Claim language that further defines a generic term,

20

such as nouns or adjectival qualifications that appear before or after the word "means," can add or suggest sufficient structure to avoid § 112, ¶ 6. *Mass. Inst. of Tech. and Elecs. for Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006). Moreover, § 112, ¶ 6 may be avoided where "the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function." *Id.* at 1356.

The Federal Circuit often holds that structural terms followed by "means" suggest sufficient structure to avoid § 112, ¶ 6. *See TecSec, Inc. v. Int'l Bus. Machines Corp.*, 731 F.3d 1336, 1348 (Fed. Cir. 2013) ("system memory means" not subject to § 112, ¶ 6 because "a 'system memory' is sufficient structure to perform the general function of 'storing data'"); *Masimo Corp. v. Sotera Wireless, Inc.*, No. 2022-1393, 2023 WL 6990542, at *3 (Fed. Cir. Oct. 24, 2023) ("physiological sensor means" not subject to § 112, ¶ 6); *LSI Indus., Inc. v. ImagePoint, Inc.*, 279 F. App'x 964, 971 (Fed. Cir. 2008) (*nonprecedential*) ("channel means" not subject to § 112, ¶ 6).

Here, a POSITA would recognize that a "power control means" that adjusts the transmission power in a telecommunications system is structural, and a POSITA would recognize it as common parlance for a power controller, which is specific circuitry. (Ex. 1 (Lanning Decl.), ¶¶43-44.)

21

The term "power control means" is used in the patent in the context of telecommunication systems, such as UMTS, explaining that the invention "describes a system with particular reference to the emerging Universal Mobile Telecommunication System (UMTS)." ('028 Patent, 1:6–8.) It also refers to widely known terms of art, such as downlink control channels, uplink control channels, uplink data channel, and ACK. (*See, e.g., id.*, FIG. 2, 3:18-33, Claim 11.)

A POSITA would understand the term "power control means" to refer to a power controller of the type generally used in UMTS systems. Philips's expert, Mr. Lanning, explains that the "power control means" limitation suggests a sufficient structure, or class of structures, namely: a power controller implemented within the mobile station. (Ex. 1 (Lanning Decl.), ¶¶43-44.) In the UMTS context, a POSITA would understand a power controller to include both (i) circuitry with control logic determining whether a power adjustment is necessary, and (ii) a variable-gain amplifier stage that applies the calculated adjustments to the actual RF output signal level. (*Id.*, ¶44.) The specification's identification of element (118) as the part of the secondary station[7] performing these power control functions ('028 Patent, 3:11-14),[8] together with the well-known power controllers in UMTS-

---

[7] The base station also has a power controller, identified at element 107 in Figure 1, as performing these functions from the base station perspective, but that is not relevant here. ('028 Patent, 3:8.)

[8] With respect to the '216 Patent, *see* '216 Patent, 3:19-22.

22

compliant systems, makes clear that the term refers to a recognized class of physical structures.

The Federal Circuit has held that a similar "means" term was functional. In *Lighting Ballast Control LLC v. Philips Electronics North America Corporation*, the Federal Circuit affirmed the district court's finding that the claim term "voltage source means" did not fall under § 112, ¶ 6 because it conveyed sufficient structure to a POSITA. 790 F.3d 1329, 1339 (Fed. Cir. 2015). The district court relied on expert testimony and statements from the inventor showing that skilled artisans understood "voltage source means" to refer to a rectifier or other established structure for providing voltage. *Id*. The court explained that functional language following a "means" term can specify a known class of structures, and because the record showed that "voltage source means" identified a particular physical structure familiar to those in the art, § 112, ¶ 6 did not apply. *Id.* at 1338-39; *see also Comtech EF Data Corp. v. Radyne Corp.*, No. CV-06-1132-PHXMHM, 2007 WL 5041159, at *16–17 (D. Ariz. Oct. 12, 2007), *report and recommendation adopted in relevant part*, No. CV06-1132-PHX-MHM, 2008 WL 906532 (D. Ariz. Mar. 31, 2008) (finding that the term "power supply means" was not subject to § 112, ¶ 6 in the context of a claim for a radio frequency (RF) converter system for transmission of communication signals).

23

The intrinsic record and Mr. Lanning's testimony rebuts the presumption that § 112, ¶ 6 applies. The claims and specification, viewed through the lens of a POSITA, show that "power control means" names a known, concrete class of structures: a UMTS transmit power controller that includes circuitry with control logic and a variable-gain amplifier. For the same reasons as described in *Lighting Ballast Control* and *Comtech*, "power control means" is not subject to § 112, ¶ 6.

> ii.    <u>Quectel Improperly Includes a Transceiver and Antenna as Corresponding Structure to the "Power Control Means."</u>

Alternatively, if § 112, ¶ 6 applied, the parties agree that the function of the "power control means" is "adjusting power levels of the uplink control channel prior to the initial transmission of the data on the uplink data channel." However, Quectel improperly points to more structure than is necessary to perform the function. The specification identifies "power control means (PC) 118" as the sole structure in the mobile station responsible for "altering the transmitted power level." ('028 Patent, 3:11–14.[9]) No further structure is described or necessary. *See B. Braun Med.*, 124 F.3d at 1424 ("specification or prosecution history [must] clearly link[] or associate[]" the structure to the function). Quectel's attempt to identify a transceiver and antenna as corresponding structure to the function should be rejected.

---

[9] For the '216 Patent, *see* '216 Patent, 3:19–22.

The antenna's role has no connection to power control. Rather, it is a passive interface with the environment. ('028 Patent, Fig. 1; 3:3–17 (antenna means 116);[10] Ex. 1 (Lanning Decl.), ¶44.) The transceiver's role is to generate radio frequency signals from electrical signals and to extract electrical signals from received radio signals. (*Id.*, ¶¶44, 48-50.) Neither performs the function of adjusting power levels. (*Id.*, ¶44.)

Even if the transceiver and antenna were to enable power control (which they do not), it is not proper to include them as corresponding structure. Again, the *Asyst* case described above applies. Just as the corresponding structure to the "microcomputer means for receiving and processing digital information communicated with said respective … two-way communication means" limitation in *Asyst* did not include the computer and the connecting wire, *Asyst*, 268 F.3d at 1370-71, here, at most, the antenna 116 and transceiver 114 merely enable power control means (PC) 118 to perform its function. They do not actually perform the function of adjusting power levels. The corresponding structure should be limited to a power controller.

### b. Quectel's Answering Position

The parties dispute whether this term invokes Section 112 ¶ 6. Quectel contends that it does and identifies "adjusting power levels of the uplink control

---

[10] For the '216 Patent, *see* '216 Patent, Fig. 1; 3:12-25 (antenna means 116).

25

channel prior to the initial transmission of the data on the uplink data channel" as its function. To the extent this term invokes Section 112 ¶ 6, Philips agrees to Quectel's identified function. If the Court construes this term as a means-plus-function limitation, a POSITA would have understood that the structure for performing the claimed function is "transceiver (Tx/Rx) 114 connected to antenna 116, power control (PC) 118." *See* Ex. 4 (Min Decl.), ¶¶ 76-83. Philips only proposes "power controller" as corresponding structure.

i.      Philips Fails to Overcome the Presumption that Section 112 ¶ 6 Applies

As an initial matter, "power control means" is subject to Section 112 ¶ 6. Claim 12 expressly uses "means for" claim language:

> 12. The secondary station of claim 11, further comprising: power control **means for** adjusting power levels of the uplink control channel prior to the initial transmission of the data on the uplink data channel.

'028 Patent, cl. 12. The use of "means for" creates a strong rebuttable presumption that this term invokes Section 112 ¶ 6. *See Williamson*, 792 F.3d at 1348 ("our precedent has long recognized the importance of the presence or absence of the word 'means' [which] creates a rebuttal presumption that § 112, para. 6 applies"); *see also Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, 899 F.3d 1291, 1297-98 (Fed. Cir. 2018). Philips failed to meet its burden for overcoming this

26

presumption.  It offers nothing more than conclusory assertions supported by a barrage of off-point case law followed by its expert's *ipse dixit* opinion.

The District of Delaware squarely addressed a "power control means" limitation in *St. Clair Intell. Prop. Consultants v. Toshiba Corp.*, finding it to invoke § 112 ¶ 6.  2015 WL 865474, at *2 ("'power control means' is a **means-plus-function limitation**").  The court reasoned that "[b]ecause 'power control means' includes the word 'means,' the term is presumed to be a means-plus-function limitation," adding "given the fact that the [asserted] **patent is rife with means-plus-function limitations**, it is evident that the **patent drafters knew how to and, indeed, intended to, draft claims that would be governed by section 112, paragraph six**."  *Id.*, *5-6.  So too here—the '028 Patent (and its child, the '216 Patent) is rife with means-plus-function claim limitations, as evidenced by Philips's own acknowledgement that numerous other terms invoke § 112 ¶ 6.

Philips strings together seven off-point Federal Circuit and district court cases—each arising from distinct facts, specifications, and different disputed terms—to imply that it somehow overcame the presumption.  (*See supra*, pp. 20-24.).  Setting aside the fact that these cases stand as exceptions, not the rule, none of these cases are relevant to construing "power control means."  In particular, Philips glosses over that in one of its cases, *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 790 F.3d 1329, 1339, 1341-42 (Fed. Cir. 2015),

"control means"—which more closely tracks this term—invokes Section 112 ¶ 6, even when "voltage source means" does not.  The Federal Circuit held that "the term 'control' failed to convey sufficient structure to rebut the presumption that means-plus-function claiming applied because **'control' is simply an adjective describing 'means'**: it is not a structure or material capable of performing the identified function."  *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 498 F. Appx. 986, 990 (Fed. Cir. 2013) (emphasis added).  If "control means" is a means-plus-function limitation, so is "power control means."  *See Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 948 (Fed. Cir. 2007) ("the claim limitation 'control means' has no corresponding structure described in the specification as required by 35 U.S.C. 112, P 6").

ii.      <u>Philips's Proposed Construction is Incomplete</u>

A standalone "power controller" is insufficient to comprise a corresponding structure for "power control means."  Philips's proposed structure merely rewords "power control means" into its generic structural equivalent: "power controller."  *See Uniloc USA, Inc. v. AVG Techs. USA, Inc.*, No. 2:16-CV-00393-RWS, 2017 WL 1154927, *4 (E.D. Tex. Mar. 28, 2017) ("Generally, means-plus-function claims have a narrower scope than non-means-plus-function claims" for "they may be patent-eligible even when similar non-means-plus-function claims are not.").  A "patentee cannot avoid a means-plus-function construction by merely replacing the

28

term 'means' in the claims with other, equally functional language. This superficial change does not change the functional nature of the limitation." *WSOU Investments LLC v. Google LLC*, No. 2022-1064, 2023 WL 6531525, at *5 (Fed. Cir. Oct. 6, 2023).

The '028 Patent does not claim adjusting transmission power levels in a vacuum. It is not possible for a standalone power controller to adjust power levels of the uplink control channel "prior to the initial transmission of the data on the uplink data channel" without at least a secondary station's transceiver and antenna. *See* Ex. 4 (Min Decl.), ¶¶ 76-83. The parties' agreed-upon function requires adjusting power levels at a specific time—"prior to the initial transmission of data"—which a power controller cannot monitor alone. Philips's proposed structure disregards the interactive relationship between the primary and secondary stations. Moreover, Philips's proposed structure omits necessary components for transmitting and receiving signals to adjust said power levels. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1321 (Fed. Cir. 2003) ("the structure must be necessary to perform the claimed function.").

Philips's arguments address the function of "adjusting power levels" only, not the pertinent function of "adjusting power levels of the uplink control channel prior to the initial transmission of the data on the uplink data channel." (*See supra*, pp. 24-26.). Quectel concedes that a standalone power controller can adjust power

29

levels, but this structure is insufficient for performing the claimed function. The '028 Patent illustrates that all of the structural limitations in Quectel's construction are required. *See* '028 Patent, 3:3-14; 3:34-62; Figs. 1-4. Indeed, a POSITA would have recognized that a power controller alone cannot adjust power levels of the uplink control channel prior to the initial transmission of the data on the uplink data channel as required by the claims. *See* Ex. 4 (Min Decl.), ¶¶ 76-83.

For the reasons above, the Court should adopt Quectel's proposed construction.

### c.    Philips's Reply Position

#### i.    "Power Control Means" Is Not Subject To § 112, ¶ 6

As previously explained, case law supports that "power control means" is not subject to § 112, ¶ 6. (*Supra*, 20-24.) Mr. Lanning confirmed this and presented evidence demonstrating that a POSITA understood "power control" to designate structure. (Ex. 1 (Lanning Decl.), ¶¶43-44.)

Quectel's cited cases fail to support its argument. Quectel cites to *St. Clair Intell. Prop. Consultants, Inc. v. Toshiba Corp.*, but there, "no evidence was presented that persons of skill in the art would understand 'power control means' to designate structure." 2015 WL 865474, at *2. Here, the evidence shows the opposite. Mr. Lanning opines that a POSITA "would have been familiar with technology areas such as CDMA…" because CDMA techniques were foundational

30

in 2G and carried forward into 3G systems. Ex. 1 (Lanning Decl.), ¶43. Mr. Lanning and the patent explain that power control is a fundamental aspect of CDMA systems (*id.*, ¶¶43–44; '028 Patent, 1:32–39) and that "power control … refer[s] to a known class of structural subsystems." (Ex. 1 (Lanning Decl.), ¶44.)

As a further example, the '028 Patent references U.S. Patent No. 5,056,109 ("'109 Patent"), which is related to power control in CDMA systems. ('028 Patent, 1:32–39; Ex. 15 ('109 Patent), Title.) The '109 Patent includes substantial disclosure describing power control circuitry. ('109 Patent, 13:31–14:3, 14:10–41.) This demonstrates that power control and the related power control structure was well-known to skilled artisans. (Ex. 1 (Lanning Decl.), ¶44.)

Quectel also cites to *Lighting Ballast Control LLC v. Philips Electronics North America Corp.*, 790 F.3d 1329, 1339 (Fed. Cir. 2015) (*Lighting Ballast II*"), and an earlier panel decision in that case, *Lighting Ballast Control LLC v. Philips Electronics North America Corp.*, 498 F. Appx. 986, 987 (Fed. Cir. 2013) ("*Lighting Ballast I*") (*supra*, pp.27-28). But Quectel misrepresents the facts and holdings in those cases in asserting that the Federal Circuit determined that "control means" in the *Lighting Ballast* patent was a means-plus-function term. (*Id.*) This is false. The court only addressed the term "voltage source means" with respect to the means-plus-function issue. *See Lighting Ballast I*, 498 F. Appx. at 989-92; *Lighting Ballast II*, 790 F.3d at 1336-39.

31

Moreover, even if there had been such a (phantom) holding in *Lighting Ballast I* about "control means," Quectel ignores that "control" in *Lighting Ballast* was in the context of electronic ballasts, not telecommunications, like here, where a POSITA has a different understanding of the term. (Quectel also conflates "control" with "power control".)

What Quectel misleadingly cites is actually a quote from *Biomedino, LLC v. Waters Technologies Corporation*, 490 F.3d 946 (Fed. Cir. 2007), not a holding from *Lighting Ballast. Lighting Ballast I* merely cited *Biomedino* in support of its ruling that was later reversed in *Lighting Ballast II*. In *Biomedino*, though, again, the technology was completely different – regeneration devices (*id.* at 948-49), not telecommunications. And the "control means" in *Biomedino* was for "automatically operating valves[/valving]." *Id.* The cases and technologies, and the understanding of a POSITA in them, are completely different.

<ol type="i" start="2"><li>Quectel Improperly Includes a Transceiver and Antenna as Corresponding Structure to the "Power Control Means"</li></ol>

Alternatively, if § 112, ¶ 6 applied, a power controller is sufficient corresponding structure. Quectel argues that "power controller" is the functional equivalent of "power control means," but that actually underscores Philips's point from above: a POSITA would understand "power control means" to denote the known structure of a power controller.

32

Further, Quectel's case law support, *WSOU*, involved a far broader term, "processor." The court in *HTC Corporation v. IPCom GmbH & Co., KG*, for example, determined that "processor" refers to nothing more than a general purpose computer. 667 F.3d 1270, 1280 (Fed. Cir. 2012). Moreover, the specification of the patent in *WSOU* did not teach to anchor "processor" to a defined structure. *See WSOU*, 2023 WL 6531525, at *4 (the patent "does not describe any 'processor…'").

Here, in contrast, a "power controller" was a well-known structure to a POSITA at the relevant time, and the '028 Patent specification also included sufficient reference to inform a POSITA. (Ex. 1 (Lanning Decl.), ¶¶43-44; '028 Patent, 1:32–39.)

Quectel contends that a "standalone" power controller cannot meet the agreed function, arguing that antennas/transceivers are "necessary" because the power controller "cannot monitor alone" in order to ensure the power is adjusted "prior to the initial transmission of data." (*Supra*, pp.28-30.) But "monitoring" is not the claimed function; adjusting is. *See Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) (finding that "[u]nder § 112, ¶ 6, a court may not import functional limitations that are not recited in the claim, or structural limitations from the written description that are unnecessary to perform

the claimed function," and therefore finding error in district court's interpreting the function of "circulating air" as requiring structure capable of "recirculating").

Quectel asserts that the power controller operates via a transceiver and antenna that deliver power control commands. (*Supra*, 29 (citing Ex. 4 (Min Decl.), ¶¶ 76-83).) Even if the '028 Patent required the power controller to work this way (it does not), power control commands merely instruct the controller to perform the claimed adjustment. The commands, transceiver, and antenna do not themselves make the adjustment. "The corresponding structure to a function set forth in a means-plus-function limitation must actually perform the recited function, not merely enable the pertinent structure to operate as intended." *Asyst*, 268 F.3d at 1370; *see also Masimo Corp. v. Philips Elecs. N. Am. Corp.*, No. 09–80–LPS–MPT, 2011 WL 678447, at *12 (D. Del. Feb. 18, 2011) ("as in *Asyst*, the components Masimo proposes be included merely enable Signal Processor 360 to perform the claimed function"); *Smith Int'l, Inc. v. Baker Hughes Inc.*, No. 16-56-ECR, 2018 WL 3381299, at *2 (D. Del. July 11, 2018) ("The remainder of the items cited by Plaintiff move the arms into the expanded position, and thus 'enable the pertinent structure to operate,' but it is the spring retainer and upper cap that actually adjust the amount of expansion that is possible, and thus, 'actually perform the recited function'").

34

Moreover, power control commands are not even necessary for the power controller to perform the recited function. The specification discloses: "A fixed power control adjustment could be applied at the start of the transmission. This could be done even before receipt of any valid power control command, but the size and direction might be predetermined…" ('028 Patent, 4:53-56.)

Quectel's argument is also flawed because it draws an arbitrary line, contrary to law. Quectel claims the antenna and transceiver must be part of the corresponding structure since they allegedly relay power control commands to the power controller. (*Supra*, pp.28-29.) But those commands originate from the base station (*see, e.g.*, '028 Patent, Fig. 1). Where does the line end? By Quectel's logic, the base station and its components would also need to be included—an absurd result. This is, again, why the Federal Circuit limits corresponding structure to what is necessary to actually perform the claimed function. *See Asyst*, 268 F.3d at 1370.

The term "power control means" conveys structure to a POSITA— specifically, a power controller—making § 112, ¶ 6 inapplicable. But even if § 112, ¶ 6 applied, the corresponding structure is a power controller, not various other components the radio communication system.

35

d.    Quectel's Sur-Reply Position

Philips fails to meet its burden to overcome the presumption that "power control **means**" invokes § 112 ¶ 6. *See Dyfan v. Target Corp.*, 28 F.4th 1360, 1365 (Fed. Cir. 2022). Philips's repeats the same caselaw analysis mistakes from its Opening Brief—the cases all arise from distinct facts, specifications, and terms.

This "patent is **rife with means-plus-function limitations**, it is evident that the patent drafters knew how to and, indeed**, intended to, draft claims that would be governed by section 112, paragraph six**." *St. Clair Intell. Prop. Consultants,* 2015 WL 865474, at *2. Philips relies on *ipse dixit* expert opinion that "a POSITA understood 'power control' to designate structure" along with argument regarding a separate patent directed to "[a] power control system for a cellular mobile telephone system." (*Supra*, pp. 30-31.); U.S. Patent No. 5,056,109 at Abstract. These arguments cannot overcome the presumption, based on the actual claim language and additional evidence, that § 112 ¶ 6 applies. *See* Ex. 26 (2021-11-19 IPR2021-00560 Ding Tr.) at 52:17-20 ("Q. … this term is governed by §112, paragraph 6, correct? A: Yes.").

As a means-plus-function term, a standalone power controller does not comprise corresponding structure to perform the claimed function. First, Philips mischaracterizes Quectel's Brief, recasting straightforward technical descriptions of cellular communications as efforts to import new functions. (*See supra*, pp. 20-

36

36.).  Second, Philips provides an irrelevant hypothetical that "power control commands are not even necessary for the power controller to perform the recited function" because "[a] fixed power control adjustment could be applied at the start of the transmission … even before receipt of any valid power control command." *(See supra*, p. 35).  This agreed upon function requires adjusting the power **prior to the initial transmission of data**, and so fixed power control adjustment before receipt of power control commands is irrelevant.  *See* Section IV.A, *infra*.  Third, Philips resorts to a logically flawed argument attributing positions Quectel never took to incorrectly suggest that Quectel somehow "draws an arbitrary line." *(Supra*, p. 36).  The Court should swiftly reject these arguments.

Philips's arguments that "power control commands merely instruct the controller to perform the claimed adjustment" and "commands, transceiver, and antenna do not themselves make the adjustment," (*supra*, pp. 34-35.), contradict its prior IPR statements and ignore that an antenna is necessary to receive such commands.  Ex. 27 (2022-07-12 IPR2021-00560 Oral Hr'g Tr.) at 67:24-25 (Philips arguing that "power control commands are essential to the functioning of the CDMA system").  Philips attempts to downplay power control commands—received at an antenna and demodulated by a transceiver before arriving at a power controller—should not be ignored in construing this term.

37

Further, Philips offers no meaningful support for its assertion that "'power controller' was a well-known structure to a POSITA" besides Dr. Lanning's conclusory assertions and the '028 Patent's brief discussion of prior art which does not disclose a "power controller." (*See supra*, pp. 35-36.); '028 Patent at 1:32-39. Philips points to *WSOU Investments LLC v. Google LLC*, No. 2022-1064, 2023 WL 6531525, at *4 (Fed. Cir. Oct. 6, 2023), but the '028 Patent is no different from the missing "processor" of *WSOU*—nowhere in the four corners is any actual description of "power controller." *See generally* '028 Patent. Quectel's construction should be adopted.

### 3. **"control channel"**

#### a. Philips's Opening Position

This term is clear and has a plain and ordinary meaning. If construction is necessary, it can simply be that a "control channel" is a channel that communicates "control information." The specification repeatedly states that the uplink and downlink control channels are "for transmission of control information." ('028 Patent, 1:51–56, 1:64–67, 2:8–11, 2:21–23.) Philips's proposed construction is thus supported by the specification, while Quectel's proposed construction is not.

Quectel wrongly equates the "control channel" with what the "control information" communicated on the channel is used for. "Control information" in the specification is information that is "required to set and monitor various

parameters of the transmission channel to enable the BS and MS to exchange the required user traffic." (*Id.*, 1:14–17.) However, the channel *itself* does not "set" or "monitor" transmission on a data channel. It simply communicates the information that does. In short, the "control channel" can be thought of, at best, as the messenger—not the manager—of transmission parameters. (*See* Ex. 1 (Lanning Decl.), ¶52.)

Quectel also incorrectly attempts to insert that the channel "is established in response to a request for resources." The '028 Patent does not define "control channel" as one that must be established in response to a resource request. While certain claims—such as Claim 11—specify that particular control channels are used following a resource request, this requirement comes from the claim language, not from the term "control channel" itself. For example, Claim 11 recites:

> wherein, **subsequent to a reception of the acknowledgement** by said secondary station, **control information is initially transmitted on an uplink control channel and a downlink control channel** between the primary station and said secondary station;

('028 Patent, Claim 11.)

Thus, the linkage between resource requests and control channel establishment is specific to the requirements in the claim language itself. It is not inherent to the definition of "control channel." *See Friskit, Inc. v. Real Networks, Inc.*, 306 Fed. Appx. 610, 615 (Fed. Cir. 2009) (rejecting patentee's argument that

39

"control a media player" should be construed to require "direct control" where another limitation expressly recited "direct control").

While the specification does recite an embodiment in which there is a "request 202 (REQ) for resources," a "transmit[al] [of] an acknowledgement 204 (ACK)," and then "[a]fter the acknowledgement 204 has been sent, two control channels (CON) are established, an uplink control channel 206 and a downlink control channel 208, and an uplink data channel 210 is established" ('028 Patent, 3:26-29), it is improper the read embodiments into the claims. *See Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) ("We do not read limitations from the specification into claims").

Moreover, the doctrine of claim differentiation also demonstrates that Quectel's proposed construction is wrong. "Control channel" is recited in another patent of the same family wherein there is no requirement that the control channel is established in response to receiving an acknowledgement. (*See* '216 Patent, Claim 1); *see also Lowe v. ShieldMark, Inc.*, No. 2021-2164, 2022 WL 636100, at *5 (Fed. Cir. Mar. 4, 2022) (for claims directed to floor marking tape, district court erred in construing "lateral edge portion" to require "shoulders" as that construction improperly read a limitation into the term where the parent patent had claims expressly reciting the presence of shoulders).

40

b.      Quectel's Answering Position

Philips seeks a claim scope that directly contradicts the meaning it advocated in an IPR proceeding on claim 11 of the '028 Patent. In its Patent Owner Response, Philips advocated:

> Thus, in the '028 patent, a "*control channel*" is not just any channel that communicates some form of control information. It is a channel *that is established in response to a request for resources and sets and monitors transmission on a data channel.* IPR2021-00560, Paper 10 (Patent Owner Response) at 16 (emphasis original); *see also id.* at 36-37 (arguing over the prior art based on this meaning).

This construction is precisely what Quectel proposes. Philips retreats from its prior statements, now arguing that the "control channel" is "[any] channel that communicates [some form of] control information." *Compare* Philips's proposed construction, *with* Ex. 25 (Patent Owner Response) at 16. Yet, in the sentence above—and numerous other places throughout the IPR proceeding—Philips said exactly the opposite: the "control channel" is **not any channel** that communicates control information. Ex. 25 at 16; Ex. 8 (IPR2021-00560, Paper 15) at 4 ("A '*control channel*' is not just any channel that communicates any 'control information.'") (emphasis original).

The '028 Patent specification sets forth specific parameters for how the channel is established and the setting and monitoring of transmissions on the data channel. '028 Patent, Fig. 2 (showing establishment of the control channel after a

41

request for resources), 1:14-17, 3:18-33.  Philips itself repeatedly advocated precisely this meaning, relying on these same disclosures in the specification and the same expert it now uses to assert a different meaning.  *See* Ex. 6 (IPR2021-00560, Paper 10) at 16-17 (advancing this argument, with citations to Mr. Lanning's declaration); Ex. 7 (IPR2021-00560, Ex. 2004 (Lanning Decl.)) at ¶¶ 100-01; Ex. 8 (IPR2021-00560, Paper 15) at 16 (advocating that "the claimed uplink/downlink control channel are particular channels that set and monitor parameters of the traffic control," and then using this meaning to distinguish over the Lomp prior art reference).  And the USPTO acknowledged Philips's arguments and found them persuasive for Philips's arguments of the distinction over the prior art.  *See* Ex. 9 (IPR2021-00560, Paper 23) at 8 ("Patent Owner argues that Figure 2 of the '028 patent shows that the control channels are 'established in response to a request for resources and set[] and monitor[] transmission on a data channel.'")

Philips must not be permitted to advocate for one meaning to preserve validity at the USPTO and argue the exact opposite when seeking to establish infringement in this Court.  *Aylus Networks, Inc. v. Apple, Inc.*, 856 F.3d 1353, 1362 (Fed. Cir. 2017) ("we hold that statements made by a patent owner during an IPR proceeding, whether before or after an institution decision, may be considered for claim construction and relied upon to support a finding of prosecution disclaimer"); *see also Shire Development, LLC v. Watson Pharms., Inc.*, 787 F.3d

42

1359, 1366 (Fed. Cir. 2015) (even when "prosecution history statements do not rise to the level of unmistakable disavowal, they do inform the claim construction"). Philips should not be permitted to set forth new, inconsistent arguments about the specification, claims in other patents, or its own expert's inconsistent opinions that seek an alternative meaning to what it explicitly advocated to overcome an IPR challenge.  *See Aylus*, 856 F.3d at 1362.

c.    Philips's Reply Position

A complete review of the relevant '028 Patent IPR history confirms Philips's proposed construction, despite Quectel's attempt to support its position by cherry-picking statements out of context.

Quectel cites the snippet below:

Thus, in the '028 patent, a "*control channel*" is not just any channel that communicates some form of control information. It is a channel *that is established in response to a request for resources and sets and monitors transmission on a data channel*.

(*Supra*, pp.41-42 (quoting Ex. 6 (IPR2021-00560, Paper 10 (Patent Owner Response) at 16) (emphasis original)).) However, Quectel makes various misrepresentations and omits numerous facts.

First, Quectel misdescribes this quotation from the Patent Owner Response as a construction sought by Philips. It was not. The term being construed in the IPR was **the entire limitation**: "subsequent to a reception of an acknowledgement by the secondary station …." (Ex. 6, p.15; *see also* Ex. 7 (IPR2021-00560, EX2004,

43

¶104 (referring to entire claims, not specific claim terms like "control channel")).) The term "control channel," in isolation, was not being construed.

Second, and relatedly, the above-quoted sentence was therefore only made by Philips in the context of explaining the proposed construction of the longer term, for which the issue presented was whether the claims require that "an *acknowledgement* of a request for resources by a secondary station *precedes any initial transmission of control information (such as power control commands) on the uplink and downlink control channels, which are established after the acknowledgement is received by the secondary station.*" (Ex. 6, p.17 (emphasis in original).) The issue was not how to define control channel.

The PTAB similarly did not construe "control channel," and instead construed **the overall claim limitation (11(c))** "to require that, subsequent to a reception of the acknowledgement by said secondary station, control information is transmitted for the first time on the particular claimed uplink and downlink control channels between the primary station and the secondary station." (Ex. 9 (2022-09-09 Final Written Decision), p.14.)

Third, Quectel also ignores that just two paragraphs earlier in the IPR patent owner response, Philips had explained the distinction between "control *channel*" and "control *information*:" "*a control channel*…communicates *control information used to set and monitor the transmission channel*…" (Ex. 6, p.16.) Thus, Philips's

44

statements in the IPR were actually clear that control information—not a control channel—is used to set and monitor transmission on a data channel.

As previously discussed, a "control channel" is simply a channel that communicates control information. The specification repeatedly states that the uplink and downlink control channels are "for transmission of control information." ('028 Patent, 1:51–56, 1:64–67, 2:8–11, 2:21–23.) The term does not inherently require that it is established in response to a request for resources.

Indeed, there is *other* language in the claim itself stating that control information is initially transmitted "subsequent to a reception of the acknowledgement." ('028 Patent, claim 11 (8:9-10).) But that is not part of the definition of "control channel" itself.

Additionally, as explained in Philips opening position (*see supra*, p.40), claim differentiation requires that Quectel's proposed construction is incorrect because in the '216 Patent (in the same family as the '028 Patent), the term "control channel" also appears, but there is no requirement in the '216 patent claims that the control channel is established in response to receiving an acknowledgement it.  (*See, e.g.*, '216 Patent, Claim 1.) Quectel fails to address this issue.

Quectel's arguments are mischaracterizations of the IPR.

45

d.      Quectel's Sur-Reply Position

Philips again sidesteps intrinsic evidence and its own statements.  Federal Circuit law provides that "statements made by a patent owner during an IPR proceeding, whether before or after an institution decision, may be considered for claim construction and relied upon to support a finding of prosecution disclaimer." *Aylus,* 856 F.3d at 1362.  Philips does what *Aylus* expressly forbids—"argu[ing] one way in order to maintain their patentability and in a different way against accused infringers."  *Id.* at 1361 (citation omitted).

The intrinsic record plainly shows Philips arguing in IPR that a control channel is exactly Quectel's proposed construction.  *See* Ex. 6 (IPR2021-00560: Paper 10) at 16 ("a 'control channel' is not just any channel that communicates some form of control information.  **It is a channel that is established in response to a request for resources and sets and monitors transmission on a data channel**."); *id.* at 17, 36-37; Ex. 9 (IPR2021-00560: Paper 23) at 8.  Whether Philips's IPR statements were made in the context of construing a larger phrase is irrelevant—Philips repeatedly characterized a "control channel" during the IPR proceedings as "**not just any channel**" that communicates control information.  Ex. 8 (IPR2021-00560: Paper 15) at 4.  Philips should not be permitted to shift courses here and argue a broader meaning.

4.      **"subsequent to a reception of the acknowledgement by the secondary station, control information is**

46

**initially transmitted on an uplink control channel and a downlink control channel between the primary station and said secondary station"**

      a.      Philips's Opening Position

Philips's proposed construction of this term is identical to the PTAB's construction of the same term in the IPR proceeding in which Quectel was the petitioner. *See Quectel Wireless Sols. Co. Ltd. v. Philips*, No. IPR2021-00560, 2022 WL 4112074, at *5-6 (P.T.A.B. Sept. 8, 2022). The Federal Circuit also upheld the PTAB's construction on appeal. *See Quectel Wireless Sols. Co. v. Koninklijke Philips N.V.*, No. 2023-1155, 2024 WL 2064617, at *3 (Fed. Cir. May 9, 2024).

The PTAB's prior construction of a claim term is persuasive to a district court. *N. Atl. Imports, LLC v. LoCo-Crazy Good Cookers, Inc.*, No. 23-999-GBW-SRF, 2025 WL 47984, at *5 (D. Del. Jan. 8, 2025). Furthermore, the Court is bound by the Federal Circuit's affirmance of the PTAB's construction. *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1363 (Fed. Cir. 2012) (ruling that in a second lawsuit brought by the patentee, the court had to apply the construction of a prior Federal Circuit panel).

Quectel's proposed construction appears to have been plucked from a statement Philips made during the IPR proceeding *in support of Philips's own proposed construction*, as opposed to using the actual claim construction itself.

47

(Ex. 2 (IPR2021-00560, Paper 10, Patent Owner Response), 17.) Why that sentence should be used, rather than the PTAB's construction that was also confirmed by the Federal Circuit, is unexplained. Quectel seems to want to add ambiguity into the definition, but that would violate all rules of claim construction.

Claim 11 requires "control information" is transmitted *initially* on an uplink control channel and a downlink control channel between the primary station and said secondary station, *subsequent* to a reception of the acknowledgement by said secondary station. The '028 Patent clarifies that uplink and downlink control channels are established *after* the MS transmits a request REQ to the BS and receives an acknowledgement (ACK) indicating that resources are available and that the control information is transmitted on those *particular* control channels. ('028 Patent, 3:18–33.)

As before, this limitation should be construed to require that, subsequent to a reception of the acknowledgement by said secondary station, control information is transmitted **for the first time** on the particular claimed uplink and downlink control channels between the primary station and the secondary station.

> b.    Quectel's Answering Position

To narrow the issues in dispute, Quectel adopts Philips's construction of this term.

48

### 5.    "determinedly delay" ('028 Patent, claim 11)

a.    Quectel's Answering Position

Quectel contends that this term is indefinite.  Nonetheless, Quectel understands that the Court's practice involves not adjudicating indefiniteness issues at this stage.  Therefore, here Quectel simply addresses its alternative construction that the "determinedly delay" term, if not indefinite, should be construed as "a delay that is determined relative to the initial transmission of control information."

This alternative construction arises directly from the construction Philips itself advanced during *inter partes* review (IPR) proceedings at the U.S. Patent and Trademark Office.  It is well-settled that statements made during IPR proceedings are relevant to claim construction in parallel district court proceedings and can be relied upon to support a disavowal of claim scope.  *See, e.g.*, *Aylus*, 856 F.3d at 1361.

Here, Philips specifically advocated during an IPR proceeding defending an invalidity challenge to claim 11 of the '028 Patent that "the challenged claims do not encompass *any* delay in data transmission that may occur, but rather a delay that is determined relative to the *initial* transmission of control information."  Ex. 6 (IPR2021-00560, Paper 10 (Patent Owner Response)) at 18 (emphasis original).  This precisely matches Quectel's proposed construction; i.e., "determinedly delay"

49

should be construed as "a delay that is determined relative to the *initial transmission of control information.*"  Philips should not be permitted to advocate for a particular construction in IPR proceedings in an attempt to preserve validity, while seeking the more ambiguous "plain and ordinary" meaning here.  *See Data Engine Techs. LLC v. Google, LLC*, 10 F.4th 1375, 1381 (Fed. Cir. 2021) ("We have repeatedly rejected efforts to twist claims, like 'a nose of wax,' in one way to avoid invalidity and another to find infringement.")

Further, Philips repeated its assertions regarding the meaning of this claim term in its IPR sur-reply, arguing: "Petitioner's assertion that the delay is not determined 'relative to the initial transmission of the control information' . . . ignores the plain and explicit recitation in the challenged claims."  Ex. 8 (IPR2021-00560, Paper 15 (Patent Owner Sur-Reply)) at 8; *see also id.*, 17 ("Petitioner's assertion that nothing in the plain meaning of the claim language strictly limits the type of delay to one that is determined relative to the initial transmission of control information . . . is baseless") (internal quotations omitted).

Philips specifically advocated this claim language interpretation to overcome the prior art.  For example, Philips argued in the IPR proceeding that:

> "Petitioner gives no weight to the term '*determinedly*' such that any delay in data transmission would be encompassed by the claims. Petitioner's construction is in complete disregard of the claim language and specification, which plainly convey that **the delay is determined** (e.g., not a variable or random occurrence)

**relative to the initial transmission of control information**." Ex. 8 (IPR2021-00560, Paper 15) at 18.

To the extent this term is not indefinite, Philips should be bound by its statements defending against an IPR challenge to the same claim.

b.    Philips's Reply Position

If the court permits construction of this term,[11] it should be given its plain and ordinary meaning: purposeful delay.

Quectel argues that its proposed construction stems from Philips's IPR arguments. (*Supra*, pp.49-50.) But in the IPR, the construed term was "wherein the initial transmission of data on the uplink data channel is determinedly delayed until after the initial transmission of control information." (Ex. 6, IPR2021-00560, Paper 10 (Patent Owner Response), p.18.) Here, by contrast, the term is simply "determinedly delay." (D.I. 92, Ex. B at 10–11.) Conflating the two is misleading.

Philips agrees the claim language itself, without construction, ensures that "the challenged claims do not encompass any delay in data transmission that may occur, but rather a delay that is determined relative to the initial transmission of control information," which is what Philips said in the IPR. (Ex. 6, IPR2021-00560, Paper 10 (Patent Owner Response), p.18.) Notably, Quectel argued *against*

---

[11] Quectel contends that the term is indefinite (D.I. 90-2 at 10), and thus Philips believed the issue was to be saved for later summary judgment briefing, but Quectel has now also advanced an alternative proposed construction.

51

that construction in the IPR.  (Ex. 16 (Petitioner Reply), p.6.)  And even more importantly, this is not a construction adopted by the PTAB in the IPR.  (Ex. 9 (Final Written Decision), p.14 ("We determine that it is not necessary to provide an express interpretation ….").)

Thus, while Philips does not disagree with the general concept, the concept is already encompassed in the claim language itself. Moreover, in the context of claim construction for a jury, Quectel's proposed construction would result in a non-sensical construction of the overall limitation to be: "wherein the initial transmission of data on the uplink data channel is [a delay that is determined relative to the *initial* transmission of control information] until after the initial transmission of control information on the uplink control channel and the downlink control channel." This would be extremely unhelpful.

To the extent plain and ordinary meaning is not sufficient, the terms could be construed as "purposeful delay." The specification states:

> The delay in transmission of the data channel **may either be predetermined, or chosen dynamically** so that the delay in transmission of the data channel is sufficient to enable the power control means to have substantially corrected the difference between initial and target power levels in the control channels.

('028 Patent, 2:31–36; *see also id.*, dependent claims 13-14.)

52

Therefore, the purpose of the delay is to allow the power control means time to fix the power level. The plain and ordinary meaning of "determinedly delay" is thus "purposeful delay."

Further supporting this definition is the prosecution history. The examiner argued that U.S. Patent No. 6,356,759 (Mustajarvi) disclosed "determinedly delayed" by pointing to Fig. 3 step 3-5 of Mustajarvi which "shows a delay by transmitting the PACCHs before data transmissions." (Ex. 17 (4/10/2003 non-final rejection), 3.) Fig. 3 of Mustajarvi provides:



(Ex. 18 (Mustajarvi), Fig. 3.)

The examiner argued that Mustajarvi discloses "a determined delay period as shown by the break between steps 3-4 and 3-5 prior to transmission of data from the secondary station (MS) to the primary station (BSS)." (Ex. 19 (7/26/2004 Examiner's Answer to Appeal Brief), p.6.) The applicant responded:

53

**the broken lines of FIG. 3 of Mustajarvi must be interpreted as encompassing no more than a data processing time** … **Clearly, this data processing time serves no specific purpose other than to accurately prepare the data to be transmitted as quickly as possible**…

(Ex. 20 (9/27/2004 Reply Brief), p.8.)

The prosecution history thus further shows that "determinedly delay" is not just any delay—it is intentional. The delay must be "determined," meaning it is planned and serves a specific purpose, not random or incidental.

c.        Quectel's Sur-Reply Position

Philips should be held to its arguments at the PTAB. *See Aylus*, 856 F.3d at 1361. "Determinedly delay" resides in the term construed in the IPR, and Philips cannot walk back its prior statement that "the challenged claims do not encompass **any** delay in data transmission that may occur, but rather a delay that is determined relative to the **initial** transmission of control information." Ex. 6 at 18.

Philips argues that Quectel's proposed construction "would be extremely unhelpful" to a jury and cites prosecution history snippets. (*Supra*, p. 53.). But this affords no basis for Philips to undo its IPR argument that "[p]etitioner's construction is in complete disregard of the claim language and specification, which plainly convey that **the delay is determined** (e.g., not a variable or random occurrence) **relative to the initial transmission of control information**." Ex. 8 at 18. Philips's own statements support Quectel's proposed construction. *See Data*

54

*Engine*, 10 F.4th at1381 (litigants cannot "twist claims … in one way to avoid invalidity and another to find infringement.").

## IV.    '216 PATENT

### A.    Background

#### 1.    Quectel's Answering Position

The '216 Patent relates to "[a] radio communication system has means for improving power control of a communication channel for the transmission of data after an interruption in the transmission," which is accomplished by adjusting the transmission power immediately after the interruption by an offset from the power used before the interruption."  '216 Patent, Abstract; *see also* Ex. 4 (Min Decl.), ¶¶ 31-37.  The '216 Patent describes that a secondary station (e.g., mobile station, user equipment) receives power control commands from a primary station (e.g., a base station).  *Id.*, 1:8-23; Fig. 2.  The secondary station has "a power control means for adjusting the power of the control and data channels in response to the power control commands, the method comprising setting the initial transmission power after a pause in transmission to that before the pause adjusted by an offset."  *Id.*, 2:33-38.

### B.    Disputed Constructions of the '216 Patent

#### 1.    "power control means for adjusting the power of the uplink control and data channels in response to the

55

**downlink power control commands" ('216 Patent, claim 13)**

a.    Philips's Opening Position

The analysis of the "power control means" limitation of the '216 Patent is essentially the same as the analysis of that term in the '028 Patent.

i.    "Power Control Means" Is Not Subject To § 112, ¶ 6.

As described in Section III.B.2.a.i, *supra*, including the case law in support, "power control means" should not be construed as subject to §112, ¶6. A POSITA would recognize that a "power control means" that adjusts the transmission power in a telecommunications system is structural.

ii.    Quectel Improperly Includes a Transceiver and Antenna as Corresponding Structure to the "Power Control Means."

For the same reasons as described in Section III.B.2.a.ii, *supra*, including the case law in support, even if § 112, ¶ 6 applies, with the function being "adjusting the power of the uplink control and data channels in response to the downlink power control commands," Quectel improperly points to more structure than is necessary to perform the identified structure, incorrectly attempting to include a transceiver and antenna as part of the structure. Neither is part of the corresponding structure.

56

b.      Quectel's Answering Position

As Philips acknowledges, the analysis for this term is essentially the same as that for the '028 Patent. (*See supra*, p. 56.). For the same reasons described *supra* in Section III.B.2. including supporting case law, this term is a means-plus-function limitation. *See EnOcean GmbH v. Face Int'l Corp.*, 742 F.3d 955, 958 (Fed. Cir. 2014). Philips has failed to overcome the presumption that Section 112 ¶ 6 applies.

For the same reasons described *supra* in Section III.B.2, including supporting case law, this Court should adopt Quectel's proposed structure of "[t]ransceiver (Tx/Rx) 114 connected to antenna 116, and power controller (PC) 118 including the corresponding description of the algorithm at '216 Patent at 3:11-64." Philips's proposed structure of a standalone power controller cannot perform the parties' agreed-upon function of "adjusting the power of the uplink control and data channels in response to the downlink power control commands." A POSITA would understand that in addition to a power controller, a transceiver and antenna are minimally necessary components to perform the agreed upon function. *See* Ex. 4 (Min Decl.), ¶¶ 76-83, 85-93.

c.      Philips's Reply Position

The analysis of "power control means" is essentially the same for the '216 Patent as it is for the '028 Patent. As described in Section III.B.2.a.i above, "power

57

control means" should not be construed to implicate § 112, ¶ 6.  (Ex. 1 (Lanning Decl.), ¶¶43-44.)

Even if § 112, ¶ 6 applies, for the same reasons described in Section II.B.2.a.ii structure is a power controller, not the collection of a power controller, transceiver, and antenna as Quectel contends.  (*See supra,* Section III.B.2.a.i.)

Quectel's proposed structure is also contrary to what it argued during the IPR and what the PTAB determined. Quectel argued that the structure was "power control means (PC) 118," along with a portion of the specification, and did not contend that the transceiver nor antenna were part of the structure.  (Ex. 10 (Quectel Petition at 7-9).)  The PTAB agreed. *Quectel Wireless Sols. Co. Ltd. v. Koninklijke Philips N.V.*, No. IPR2021-00563, 2022 WL 4280566, at *3 (P.T.A.B. Sept. 13, 2022).

### d. Quectel's Sur-Reply Position

The analysis for this term is essentially identical for the '028 Patent's "power control means."  *See* Section III.B.2, *supra*.  Philips's proposed construction disregards "in response to the downlink power control commands."  A power controller alone does not adjust power levels "in response to" specific power control commands, which it cannot by itself receive or demodulate—a transceiver and antenna are required.

58

When asked how a prior art reference applies power control commands in a mobile station, Philips's expert Dr. Charles Jackson said "[i]t increases the – or decreases the **power to the antenna** by power control size."  Ex. 28 (2022-03-03 IPR2021-00563 Jackson Tr.) at 109:9-11.  Dr. Jackson also testified that Figure 5—illustrating received power levels—shows "a desired **power level at the antenna of the mobile unit** so that the signal's strong enough to be received but not any stronger." *Id.* at 44:3-5.  Philips should be held to the intrinsic evidence of what its expert told the PTAB. *See Data Engine*, 10 F.4th at 1381.

### 2. <u>"means for setting an initial transmission power after an interruption in transmission to that before the interruption adjusted by an offset" ('216 Patent, claim 13)</u>

#### a. Philips's Opening Position

Claim 13 describes an inventive way in which the initial transmission after an interruption in transmission can be determined and set. This "means for setting" claim limitation should be read in context with the next "means for determining" limitation because they are essentially all one step. The "means for setting" is describing that the "setting of an initial transmission after an interruption in transmission [is set] to that before the interruption **<u>adjusted by an offset</u>**," and the following "means for determining" limitation then describes how that "offset" is determined, which is accomplished "from a weighted sum of power control commands in accordance with an equation …." ('216 Patent, Claim 13.)

This specific limitation, therefore, like the prior one, is referring to power control. The function is providing some further specificity on what the power control will be: "setting an initial transmission power after an interruption in transmission to that before the interruption adjusted by an offset." The structure is therefore a power controller, as the specification identifies "power control means (PC) 118" as the sole structure in the mobile station responsible for "altering the transmitted power level." (*Id.*, 3:19–22.)

Quectel's proposed construction is wrong for numerous reasons. First, Quectel proposes adding "[the uplink power]" to the function. That additional language is outside anything appearing in the actual claim language. Quectel also fails to state what it thinks the "the uplink power" means and fails to cite to any portion of the specification that uses that terminology. "A court errs when it improperly imports unclaimed functions into a means-plus-function claim limitation." *Sisvel Int'l S.A. v. Sierra Wireless, Inc.*, 82 F.4th 1355, 1370 (Fed. Cir. 2023).

Second, Quectel's proposed function inexplicitly omits "adjusted by an offset" from the function.

Third, Quectel's attempt to identify a transceiver and antenna as structure corresponding to the function is once again wrong, for the same reasons mentioned above with respect to the "power control means" limitation. *See* Sections III.B.2.a.i

60

& III.B.2.a.ii, *supra*. At best, as in *Asyst*, the antenna 116 and transceiver 114 enable power control means (PC) 118 to perform its function, but they do not actually perform the function of setting power levels. The corresponding structure to this term should be limited to a power controller.

Another problem with Quectel's proposed structure is that Quectel further proposes that the structure should also include "the corresponding description of the algorithm at '216 Patent at 4:59-5:2." No algorithm is required as structure, however. *See Qualcomm*, 6 F.4th at 1266 ("power tracker" implemented on "integrated circuit" did not require an algorithm).

Moreover, even to the extent an algorithm was required, Quectel cites to the wrong portion of the specification. The algorithm for how the initial power is set to "that before the interruption *adjusted by an offset*" under claim 13 of the '216 Patent is described at column 5:27-49, which explains how that "offset" is determined using the particular equation and then quantizing. (Here, again, it can be seen how this "means for setting" limitation and the following "means for determining" limitation must be read together because the "offset" mentioned in the "means for setting" limitation is determined in the following "means for determining the offset" limitation. To the extent an algorithm was required, the algorithm from the next limitation, for determining the "offset" referenced in this limitation, would be included.)

61

Indeed, it is unclear how Quectel would propose a jury read and understand column 4:59-5:2 as part of the structure. The disclosure provides a broad overview of potential options. It allows for the adjustment to be done before or after receipt of power control command. ('216 Patent, 4:60–61.) It allows for the size and direction to be either predetermined or determined dynamically. (*Id.*, 4:61–62.)

Philips's proposed construction should be adopted.

### b.    Quectel's Answering Position

The parties agree that this term invokes Section 112 ¶ 6.  The parties dispute the function and corresponding structure.  As to the proposed function, the parties dispute whether it includes "set the uplink power."  For the corresponding structure, Quectel proposes "an initial transmission power after an interruption in transmission [set the uplink power] to that before the interruption" as the function, and "transceiver (Tx/Rx) 114 connected to antenna 116, and power controller (PC) 118 including the corresponding description of the algorithm at '216 Patent at 4:59-5:2" as the corresponding structure.  Philips once again proposes a standalone power controller.

For the same reasons described *supra* in Section III.B.2, including supporting case law, this Court should adopt Quectel's proposed structure of "[t]ransceiver (Tx/Rx) 114 connected to antenna 116, and power controller (PC) 118 including the corresponding description of the algorithm at '216 Patent at 4:59-5:2."  Philips's

proposed structure of a standalone power controller is insufficient structure and therefore cannot perform the claimed function.

Indeed, the '216 Patent expressly acknowledges that a standalone power controller cannot perform the function of "setting an initial transmission power after an interruption in transmission to that before the interruption adjusted by an offset." The specification separates the previous term—"power control means are provided for adjusting the power of the control and data channels in response to the power control commands"—from this term using the word "and." *See* '216 Patent, 1:62-67; 2:7-12; 2:19-24. The two terms—joined by the conjunction "and"—address separate subject matter. This precludes Philips's proposed construction where a standalone power controller can comprise the corresponding structure for both terms.

> "… wherein power control means are provided for adjusting the power of the control and data channels in response to the power control commands ***and*** <u>means are provided for setting the initial transmission power after a pause in transmission to that before the pause adjusted by an offset</u>."

'216 Patent, 1:62-67; 2:7-12; 2:19-24.

Further, this term requires more than merely setting a power level. This term specifically requires timing the power setting operation to occur precisely "after an interruption in transmission to that before the interruption adjusted by an offset." A power controller cannot perform this timing-sensitive operation without additional

63

structures.  That is, a power controller alone cannot monitor whether the secondary station experiences interruptions in transmissions.  But this is precisely what the claim requires.  An antenna and a transceiver are thus necessary structures enable a power controller to perform the claimed function.  *See Omega Eng'g*, 334 F.3d at 1321 ("the structure must be necessary to perform the claimed function.").  A POSITA would understand that a transceiver and antenna are necessary components for this term.  *See* Ex. 4 (Min Decl.), ¶¶ 95-102.

c.    Philips's Reply Position

The first issue is whether "set the uplink power" should be added to the function. It should not. As previously discussed, "set the uplink power" is outside of anything in the claim.  (*See supra*, 59–62.)  Quectel provides no response, and therefore the Court should not adopt Quectel's proposed construction. *See, INVISTA N. Am. S.a.r.l. v. M & G USA Corp.*, 951 F. Supp. 2d 604, 623 (D. Del. 2013) (refusing proposed construction where "[defendant's] claim construction briefs do not argue why a 'colorant[]' … must be 'pure' or 'not have any other additives.'").

The second issue is the proper structure. For the same reasons described above regarding "power control means," the structure is a power controller.  (*See* Section III.B.2.a.i.)

64

The '216 Patent states that the power controller "(PC) 118 [is] for altering the transmitted power level." ('216 Patent, 3:21–22.) The power controller is the structure that performs the function of setting the power levels because it alters the transmitted power level. (*Id.*, 3:21–22.) After an interruption, the power controller will be the device that "alter[s]" the power to the correct level with the proper offset. (Ex. 1 (Lanning Decl.), ¶44.)

Quectel's position that the structure includes a power controller, transceiver and an antenna is wrong. Indeed, Quectel's argument that the specification of the patent separates "power control means" and "means … for setting the initial transmission power after a pause in transmission to that before the interruption adjusted by an offset" is nonsensical because Quectel itself is arguing that the "power control means" and the "means for setting …" claim limitations have the same corresponding structure (i.e., power controller, transceiver and an antenna), yet Quectel is arguing that Philips cannot contend that the limitations have the same corresponding structure (i.e., power controller).

This Quectel argument also fails because a power controller must perform both functions because it is the only structure in the mobile station for "altering the transmitted power level." ('216 Patent, 3:21–22.)

The "and" Quectel is referring to in the specification merely distinguishes between power control that occurs at all times, including during an active

65

transmission, compared to the specific power control that occurs during the time after an interruption. This is because one aspect of the invention in the '216 Patent is setting the initial power level ***after an interruption***. ('216 Patent, Abstract & 9:15-10:1.)

Quectel argues that there is a timing aspect of the limitation that cannot be performed by the power controller (*supra*, pp.63–64) and thus also requires an antenna, but this argument again fails under, e.g., *Asyst*, however. In *Asyst*, the court explained that even though a communication line "enables the claimed device to work does not mean that the communication line 51 is necessarily part of the claimed structure corresponding to one or the other of those functional limitations." *Asyst*, 268 F.3d at 1371. Similar to *Asyst*, the antenna may help to enable the power controller to know when there is an interruption so that it can "set[] an initial transmission power after an interruption in transmission," but the power controller is the sole device setting the power level because only the power controller "alter[s] the transmitted power level." ('216 Patent, 3:21-22.) Moreover, Quectel does not explain how an antenna and transceiver "monitor" whether interruptions are occurring, nor does Quectel even contend that "monitoring" is part of the claim.

Quectel's proposed structure is also contrary to what it argued during the IPR and what the PTAB determined. Quectel argued that the structure was "power

66

control means (PC) 118," along with a portion of the specification, and did not contend that the transceiver nor antenna were part of the structure. (Ex. 10 (Quectel Petition at 9–11).) The PTAB agreed. *Quectel Wireless*, 2022 WL 4280566, at *4.

Finally, Quectel's proposed structure also attempts to add "including the corresponding description of the algorithm" (D.I. 90-2), but Quectel does not include any argument on this. The algorithm should not be added for the reasons described above.

### d.    Quectel's Sur-Reply Position

To narrow disputes, Quectel agrees that "set the uplink power" can be removed from this claim term's function.  As to corresponding structure, Philips presents a standalone power controller as an all-purpose device.  Philips conflates the concept of setting transmission powers generally with setting an **initial** transmission power at a **specific timing**—"after an interruption in transmission to that before the interruption adjusted by an offset."  (*See supra*, pp. 65-67.).

Philips again relies on its strained interpretation of *Asyst*.  A standalone power controller cannot pinpoint when an "interruption in transmission" occurs, let alone whether one happened at all.  *See* Sections IV.B.1-2., *supra*.  This claim imposes precise timing requirements—signals indicating interruptions in transmissions must first be received by an antenna, then demodulated by the transceiver, and ultimately relayed to the power controller.  *See* '028 Patent, Fig. 1.

67

The Court should reject Philips's arbitrary truncation of this term's corresponding structure.

### 3. "means for determining the offset from a weighted sum of power control commands in accordance with an equation …" ('216 Patent, claim 13)

#### a. Philips's Opening Position

The parties' proposed constructions concerning the function are nearly identical here. The only difference is that Quectel improperly attempts to break apart this means limitation into separate limitations: one being the "means for determining" and the other being "and in that means are provided for quantizing …." On the other hand, Philips (correctly) proposes that the function encompasses the entire limitation. That is the reason Philips's proposed function includes, at the end, the phrase "and in that means are provided for quantizing the offset to an integer multiple of a minimum power control step size supported by the secondary station," while Quectel's proposed function omits that phrase.

The only issue for the Court to decide, therefore, is whether there are two separate means limitations to be construed here separately, or a single means limitation. It is clear that there is only one. This is because there is no completion of the "means for determining" limitation with a semicolon (";"). The phrase ends at the period ("."). Furthermore, the language is explicit is stating "in that means [for determining] are provided for quantizing …." The "in that" language explicitly

68

shows that the quantizing portion of the claim limitation is a part of the "means for determining" claim limitation, rather than a separate limitation.

Quectel is essentially asking to re-draft the claim language: (1) to have a ";" after "gap," (2) to erase the phrase "and in that," and (3) to erase "are provided for." Quectel would thus re-read the claim to have a separate new limitation that reads: "means for quantizing." There is no such limitation, however, and it is improper for Quectel to attempt to re-write the claim language.

Finally, the structure is set forth in the claim language itself, which is also equivalent to the language in the specification at 5:26-49. Quectel does not contend that there is a different structure and instead asserts indefiniteness, which is not a matter for claim construction, as it acknowledges.

     b.  Quectel's Answering Position

The parties agree that this term invokes Section 112 ¶ 6. The parties dispute the function and corresponding structure. Philips's construction is improper and illogical—a means-plus-function term's "function" cannot include an independent means-plus-function term. *See* Section IV.B.4, *infra*. These are separate means-plus-function terms warranting separate constructions. *See EnOcean*, 742 F.3d at 958.

Indeed, Philips itself advocated that the "in that means are provided for quantizing…" term is a **separate component** of the claimed secondary station

69

when attempting to preserve subject matter eligibility of this claim.  D.I. 108 at 7-8 (listing alleged claimed "radio communication system components" that include this term as a separate component from the "means for determining" element). Philips should not be permitted to argue one meaning to attempt to argue in favor of subject matter eligibility while taking the opposite approach for claim construction to seek a broader claim scope.  *See, e.g.*, *Data Engine*, 10 F.4th at 1381 (Fed. Cir. 2021) ("We have repeatedly rejected efforts to twist claims, like 'a nose of wax,' in one way to avoid invalidity and another to find infringement.").

As to the corresponding structure, Quectel proposes that the term is indefinite for lack of structure,[12] while Philips proposes "a weighted sum of power control commands in accordance with" the claimed equation.  But a "weighted sum of power control commands in accordance with" an equation is **not structure**.[13] There is no structural component disclosed in the specification, or known to a POSITA, of a "weighted sum."  *See* Ex. 4 (Min Decl.), ¶¶ 105-108.  A weighted

---

[12] Quectel understands that the Court does not hear argument regarding indefiniteness during the *Markman* hearing.  Quectel is unable to identify any corresponding structure to perform the claimed function.  Indeed, Philips itself identifies no such structure by only identifying "a weighted sum" (not structure) to perform this claim recitation.  Quectel is aware of the Court ordering and/or permitting early briefing on indefiniteness issues in past cases and believes that is warranted here.  *See, e.g.*, *Philips v. HP*, C.A. No. 20-cv-1241-CFC.

[13] Philips's inability to identify corresponding structure here further demonstrates that this claim is directed to an abstract idea utilizing a math equation, as explained in Quectel's motion for judgment on the pleadings.  *See* D.I. at 85.

sum is simply a mathematical operation itself. *See id.* Further, an "**equation is not an algorithm** that describes how the function is performed, but is **merely a mathematical expression that describes the outcome of performing the function**." *Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1334 (Fed. Cir. 2008). Philips's brief is devoid of any precedent—and Quectel is unaware of any—that supports Philips's construction that a "weighted sum" can be sufficient structure. Philips's proposition defies logic and should be swiftly rejected.

"A patentee does not obtain ownership of 'every conceivable way or means to perform the [claimed] function'—just those ways that are substantially the same as the way the patentee invented and disclosed." *Genuine Enabling Tech. LLC v. Sony Corp.*, No. 17-cv-135, 2024 WL 1255513, at *4 (D. Del. Mar. 25, 2024) (citing *Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1214 (Fed. Cir. 1998)). Philips's proposed structure merely restates the means-plus-function term by prepending the nonce term "weighted sum." The specification contains only two disclosures on using a weighted sum of power control commands, and both vaguely suggest it may be used in lieu of measuring transmitted power. *See* '216 Patent, 5:27-59. Missing here is **any** recitation of actual structure—hardware or otherwise—performing the claimed mathematical formula. *See id.*

71

Federal Circuit precedent demonstrates that Philips's approach is incompatible with the law: "What structures will the claim limitation read on? Any that fulfill the function of [a software program]. This is the epitome of functional claiming: a black box that captures any and all structures that fulfill the function, just as if 'means' was used." *WSOU*, 2023 WL 6531525, at *4 (citing *Williamson*, 792 F.3d at 1350). Philips had ample opportunity to disclose and describe hardware elements (i.e., a specific processor) as the corresponding structure during prosecution, but chose not to. Philips's after-the-fact proposed structure amounts to improper functional claiming—any "black box" for calculating "a weighted sum of power control commands in accordance with" the claimed invention could infringe. *See id.* A POSITA lacks any basis to determine the structure responsible for performing the claimed function. *See* Ex. 4 (Min Decl.), ¶¶ 105-108.

The Court should reject Philips's improper construction and deem this term indefinite despite the usual practice to adjudicate indefiniteness at a later stage.

c.      Philips's Reply Position

i.      <u>The Term Is a Single Means-Plus-Function Limitation</u>

The only issue for the Court to decide is whether there are one or two means-plus-function limitations in this limitation. There is only one.

For clarity, the first phrase and the second phrase are labeled below:

72

*[1] means* for determining the offset from a weighted sum of power control commands ..., and *[2] in that means* are provided for quantizing the offset ...." ('216 Patent, 10:1-13.)

The "*in that means*" language shows that the second "means" word is a noun that is referring back what else is "in that" first means. The lack of a semicolon separating the two phrases further supports that "in that means" is referring back to the first means. Therefore, the entire limitation is one means-plus-function limitation.

Quectel's only argument is based on a disingenuous misreading of a Philips brief from outside of the claim construction process, which is Philips's Opposition to Quectel's Motion for Judgment on the Pleadings (D.I. 108). Quectel contends that because Philips put the phrase "means for determining …" into a separate bullet point from the phrase "in that means [for determining] …" at one page in the brief, this somehow means that Philips sought a construction of the phrases as separate means-plus-function terms. (*See supra*, pp.69-70 (citing D.I. 108 at 7-8).) Philips's opposition brief says no such thing. The equation and the quantizing are obviously separate things in one sense because neither is enough, alone, to determine the offset, and thus it can be correct to put them in separate bullet points in describing them in a different brief. However, together they are the "means for

73

determining the offset" because, according to the explicit claim language, the offset is not actually determined unless and until the quantizing occurs.

Quectel also ignores that the use of the bracketed phrase "[for determining]" in Philips's opposition brief explicitly indicated that both were part of the "means for determining." (D.I. 108 at 8.)

Quectel's assertion that Philips is arguing one meaning for subject matter eligibility and another for claim construction is wrong.

ii.    <u>Quectel's Indefiniteness Arguments Are Improper</u>

In disregard of the Court's procedures and its previous statements to Philips, Quectel also argues that this claim limitation is indefinite. This is sandbagging and procedurally improper.

During a phone call on December 5, 2025, Philips's attorney asked to "understand Quectel's position on the indefiniteness arguments" (Ex. 21 [2025-12-05 Email]), and made clear it did not want to be sandbagged with indefiniteness arguments by Quectel. Quectel's attorney responded by saying that Quectel would only mention the indefiniteness positions, while asking the Court for separate briefing on them. (Ex. 22 (Littman Decl.).) Quectel then also indicated this in the joint claim chart. (D.I. 90-2 at 4 n.2 (citing *Philips v. HP*, C.A. No. 20-cv-1241-CFC, in which ***separate indefiniteness briefing*** was ordered).)

74

Quectel now argues indefiniteness for "means for determining" and "quantizing." This is sandbagging and contrary to the Court's procedures. Philips will address indefiniteness arguments in response to a separate summary judgment brief, should Quectel choose to file one.

### d.    Quectel's Sur-Reply Position

Philips contradicts its prior statements.  Philips listed this limitation and "means are provided for quantizing …" as **separate components** to preserve subject matter eligibility in its Brief in Opposition to Quectel's Rule 12(c) Motion ("Rule 12(c) Brief").  D.I. 108 at 7-8.  As Philips acknowledges, "[t]he equation and the quantizing are obviously separate things" that cannot be commingled into a single limitation.  (*Supra*, p. 74.).  These limitations use "means" to describe distinct subject matter—"determining the offset" versus "quantizing the offset." *See* Ex. 4 (Min Decl.) ¶¶ 103-14.

> For example, far from claiming a mathematical formula in the abstract, claim 13 describes in detail how the claimed power control circuitry works, including through a specific combination and arrangement of the following radio communication system components:

- "a communication channel between the secondary station and a primary station, the channel including an uplink and a downlink control channel for transmission of control information, including power control commands, and a data channel for the transmission of data;"

- "power control means for adjusting the power of the uplink control and data channels in response to the downlink power control commands;"

- "means for setting an initial transmission power after an interruption in transmission to that before the interruption adjusted by an offset;"

- "means for determining the offset from a weighted sum of power control commands…;" and

- "in that means [for determining] are provided for quantizing the offset to an integer multiple of a minimum power control step size supported by the secondary station."

D.I. 108 at 7-8.

Philips' inconsistent positions as to when quantizing occurs undermine its position that a POSITA would understand this term to refer to the same function/structure as "means [] provided for quantizing … ."  In its Rule 12(c) Brief, Philips claimed that the '216 Patent proposes using a "weighted sum of power control commands, **using the equation and then quantizing the result** to an available power step size."  *Id.* at 13.  But in its Reply Brief, Philips argued that "the **offset is not actually determined** unless and **until the quantizing occurs**."  (*See supra*, pp. 74-75.).  These conflicting statements contradict Philips's argument that a POSITA would uniformly interpret the two "means" limitations in a manner consistent with its proposed construction.  *See also* Ex. 4 (Min Decl.) ¶¶ 103-14.

76

As to Philips's baseless allegation of "sandbagging," Quectel preserved an indefiniteness construction with a footnote for future briefing and addressed the parties' proposed corresponding structures in the Joint Claim Construction Chart. (*See supra*, pp. 70-73.); D.I. 90-2 (Joint Claim Construction Statement) at 3-6.

### 4. **"[and in that] means are provided for quantizing the offset…" ('216 Patent, claim 13)**

#### a. Philips's Opening Position

*See* "means for determining" limitation, at Section IV.B.3.a, *supra*. The parties disagree on whether the entire limitation should be construed as a single limitation versus separate limitations, and Quectel's argument as to indefiniteness based on structure is not a matter for claim construction, as it acknowledges.

#### b. Quectel's Answering Position

The parties dispute whether this term requires a construction.  Quectel believes this term is subject to Section 112 ¶ 6, triggering its own construction, and proposes an indefiniteness construction given the total lack of any specification support for this term.[14]  Philips argues that this limitation is part of the previous

---

[14] Quectel understands that the Court does not hear argument regarding indefiniteness during the *Markman* hearing.  Quectel is unable to identify any corresponding structure to perform the claimed function.  Quectel is aware of the Court ordering and/or permitting early briefing on indefiniteness issues in past cases and believes that is warranted here.  *See, e.g.*, *Philips v. HP*, C.A. No. 20-cv-1241-CFC.

term, inconsistent with its positions defending against Quectel's subject matter eligibility challenge.  *Compare* (*Supra*, pp. 69-70.), *with* D.I. at 108, 7-8.

This term requires a separate construction given its independent use of the term "means … for" to describe a distinct subject matter.  *See Diebold*, 899 F.3d at 1297-98.  A standalone "means" limitation calls for an independent construction ascertaining its distinct function and structure.  Indeed, 35 U.S.C. § 112(f) provides that "[a]n element in a claim for a combination may be expressed as a means … for performing a specified function without the recital structure … shall be construed."

Here, "quantizing the offset to an integer multiple of a minimum power control step size supported by the secondary station" is functionally distinct from the previous term's claimed function of "determining the offset from a weighted sum of power control commands in accordance with an equation $\Delta P(t)=K_1\Delta P(t-1)-K_2PC(t)PS(t) … ."$  Philips cannot avoid claim construction by maintaining that this second "means" is somehow subsumed into the previous limitation.  The plain wording of the claim recites two distinct "means" elements.

This issue is particularly acute given this term's scant specification support, let alone any written description which would inform a POSITA how to perform the claimed function.  *See* Ex. 4 (Min Decl.), ¶¶ 110-114.  "Purely functional limitations that do not provide the structure that performs the recited function." *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1023 (Fed.

78

Cir. 2006) (citing *Philips v. AWH Corp.*, 415 F.3d 1303, 1311 (Fed. Cir. 2005)).

This term exemplifies purely functional claiming—the specification does not

identify any corresponding structure for performing the claimed function of

"quantizing the offset to an integer multiple of a minimum power control step size

supported by the secondary station." *See generally* '216 Patent.  And Philips offers

none.  The Court should therefore construe this term as indefinite under Section

112 ¶ 6.

<blockquote>

c.      Philips's Reply Position

i.      <u>The Full "Means for Determining …" Limitation Is a Single Means-Plus-Function Limitation</u>

</blockquote>

*See* Section IV.B.3.c.i, *supra*.

<blockquote>

ii.      <u>Quectel's Indefiniteness Arguments Are Improper</u>

</blockquote>

*See* Section IV.B.3.c.ii, *supra*.

<blockquote>

d.      Quectel's Sur-Reply Position

</blockquote>

*See* Section IV.B.3., *supra*.  This term requires a separate construction given

its independent use of the term "means … for" to describe a distinct subject matter.

A standalone "means" limitation calls for an independent construction ascertaining

its distinct function and structure.  *See* 35 U.S.C. § 112(f).  The specification does

not identify any corresponding structure for performing the claimed function and

Philips offers none.

### 5.    "interruption in transmission" ('216 Patent, claim 13)

a.    Philips's Opening Position

The construction of this term should be simple. The specification explicitly states: "An interruption is a pause or gap in transmission during which time one or more of the control and data channels are either not transmitted or not received (or both), but the logical connection between the BS 100 and MS 110 is maintained." ('216 Patent, 5:2–6.) Philips's proposed construction adopts that exact language, which would be understood similarly by a POSITA, and therefore it is clearly the correct construction. *See Phillips*, 415 F.3d at 1315 (the specification is "the single best guide to the meaning of a disputed term") (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

Philips's proposed construction is also supported by the prosecution history, as Quectel cited this exact portion of the specification during the *inter partes* review to assist in understanding the phrase's meaning (Ex. 3 (216 Patent Quectel IPR Petition), 6), as did the PTAB. *Quectel Wireless Sols.*, 2022 WL 4280566, at *3. The claim construction issue presented to the PTAB, however, was different than here, as Quectel was arguing to the PTAB that the interruption is limited to an interruption of one transmission, not consecutive transmissions. (Ex. 3 ('216 Patent Quectel IPR Petition). 7); *Quectel*, 2022 WL 4280566, at *3. Such an issue is not

80

being presented to this Court by Quectel, however, and therefore the definition from the specification should be used.

Quectel's proposal ("indicating an event after which a power level is set in order to compensate for the interruption") ignores the above-quoted language from the specification. Quectel also oddly imports other words from the claim into its proposed construction. For example, the claim limitation states: "means for setting an initial transmission power *after* an interruption in transmission …," yet Quectel seeks to re-insert the word "*after*" into the construction of "interruption in transmission." This is a problem because if Quectel's proposed construction is inserted into the overall claim limitation, the language changes from understandable to incomprehensible and confusing to a juror. To the extent a construction is necessary, on the other hand, Philips's proposed construction is actually based on the specification and could be inserted into the overall claim limitation in an understandable manner. Here is a comparison:

Quectel's proposed construction: "means for setting an initial transmission power after ***an indicating an event after which a power level is set in order to compensate for the interruption*** to that before the interruption adjusted by an offset."

Philips's proposed construction: "means for setting an initial transmission power after ***a pause or gap in transmission during which time the control and/or***

81

***data channels are either not transmitted or not received, but the logical***

***connection between the mobile station and the base station is maintained,*** to that

before the interruption adjusted by an offset."

Quectel's proposed construction is confusing and contrary to the

specification. Philips's proposed construction is supported by the specification and

not confusing to a juror.

b.    Quectel's Answering Position

The parties propose different constructions.  Quectel proposes a construction

which Philips agreed with during an IPR challenging the validity of the '216

Patent.  *See* Ex. 24 (IPR2021-00563, Paper 2 (Petition)) at 6; Ex. 11, IPR2021-

00563, Paper 7 (Institution Decision) at 7 ("Patent Owner does not traverse the

constructions proffered by Petitioner") (citing Ex. 13 (Patent Owner's Prelim.

Resp.) at 15).  Philips proposes a construction which omits the critical element of

power level setting to compensate for the interruption.

i.    Philips Mischaracterizes the '216 Patent's IPR

Philips incorrectly suggests that the PTAB endorsed its proposed

construction.  The PTAB **actually** adopted the construction Quectel proposes to

this Court.  *See* Ex. 11 (IPR2021-00563, Paper 7) at 7.  Quectel cited—and the

PTAB considered—Philips's proposed construction during IPR "to assist in

understanding the phrase's meaning," but did not adopt it for this term.  (*See supra*,

82

p. 80); *see also* Ex. 11 (IPR2021-00563, Paper 7) at 7 ("we find that Petitioner's proposed construction is supported by the '216 Patent specification and the prosecution history, and adopt Petitioner's proposed meaning of 'interruption [in] transmission' for purposes of institution.").

In the IPR, the PTAB invalidated claim 9 of the '216 Patent on obviousness grounds. *See* Ex. 12, IPR2021-00563, Paper 25 (Final Written Decision) at 17-18. In doing so, the PTAB construed "interruption in transmission" as "indicating an event after which a power level is set in order to compensate for the interruption".[15] *Id.*, 8 ("We … continue to adopt Petitioner's meaning of 'interruption [in] transmission.'").

Philips seeks to rely on one construction to litigate invalidity and subsequently pivot to a broader construction for infringement purposes. *See, e.g.*, Ex. 13, IPR2021-00563, Paper 6 (Patent Owner's Prelim. Resp.) at 32 (stating that the "[prior art] never mentions of contemplates an interruption in transmission" while applying Quectel's construction); *id.*, 43-44 (arguing that "the examiner indeed reconsidered [prior art] and determined that it fails to disclose 'setting an initial transmission power after an interruption in transmission to that before the

---

[15] Unasserted claim 9 of the '216 Patent—challenged and invalidated during IPR2021-00563—is identical to asserted claim 13 except for the last limitation. Relevant disclosures for "interruption in transmission" are identical for the two claims.

interruption adjusted by an offset'" while applying Quectel's construction).  Philips cannot disavow what it told the PTAB to defeat a validity challenge.

      ii.      <u>Quectel's Proposed Construction Aligns with the Intrinsic Record</u>

The '216 Patent shows that the claimed "interruption in transmission" relates to setting a power level.  The claimed invention is directed to a "means for improving power control of a communication channel … after an interruption in the transmission."  '216 Patent, Abstract.  The specification also acknowledges that "[a] problem with [ ] known techniques is that . . . after the transmission is interrupted, the power control loops may take some time to converge satisfactorily."  *Id.*, 1:46-49.  It further distinguishes prior art which "does not address the problem of obtaining rapid convergence of power control . . . after an interruption in, a transmission."  *Id.*, 2:51-53.  The intrinsic evidence thus confirms that "interruption in transmission" denotes an event followed by a power level setting to compensate for the interruption.

Philips's proposed construction derives from the specification but overlooks key disclosures immediately preceding it.  The '216 Patent's proposed solution of setting a power level "gives an improvement in performance" such that "[i]ncreasing the power in this way is particularly suited to the case of re-starting a transmission after at interruption."  *Id.*, 4:65-5:2.

84

To the extent Philips contends that Quectel's proposed construction may confuse jurors, this is a problem of its own making.  If a construction does not render a term completely unintelligible—which Quectel's proposed construction does not—Philips's argument to this end is irrelevant.

c.  Philips's Reply Position

The construction of "interruption in transmission" is clear because the '216 Patent's specification defines the phrase: "An interruption is a pause or gap in transmission during which time one or more of the control and data channels are either not transmitted or not received (or both), but the logical connection between the BS 100 and MS 110 is maintained." ('216 Patent, 5:2–6.)

Quectel incorrectly states that Philips agreed with Quectel's current proposed construction in IPR2021-00563. (*Supra*, p.82.) Philips did not agree with it, but rather made clear that "[f]or purposes of [the IPR] proceeding only, [Philips] does not dispute [Quectel's] construction …, but *reserves the right to do so* to the extent relevant to other issues that may be raised in other proceedings." (Ex. 23 (Patent Owner's Resp.), 17.) As previously mentioned, the construction issue in the IPR addressed whether an interruption is limited to an interruption of one transmission, not consecutive transmissions. *Quectel Wireless*, 2022 WL 4280566, at *3. The issue of multiple versus single transmissions is not at issue here, and Philips is now asserting its right to assert a construction of "interruption in

85

transmission." *See ON Semiconductor Corp. v. Power Integrations, Inc.*, No. 17-247-LPS-CJB, 2018 WL 4905591, at *3 (D. Del. Oct. 9, 2018) ("The Court recognizes its adoption of [defendant's] proposed constructions results in different constructions than the PTAB provided. However, since [the defendant] did not propose any constructions of these terms to the PTAB, it does not appear that the PTAB rejected the constructions adopted here.").

Instead of using the '216 Patent's definition cited above, Quectel pieces together four different quotations from the specification that use variations of the limitation but do not define it. (*See supra*, pp.84-85 (1) "after an interruption in transmission" ('216 Patent, Abstract); (2) "after the transmission is interrupted, the power control loops may take some time to converge" (*id.*, 1:46–49); (3) "does not address the problem of obtaining rapid convergence of power control . . . after an interruption in, a transmission" (*id.*, 2:51–53); (4) "[i]ncreasing the power in this way is particularly suited to the case of re-starting a transmission after at interruption" (*id.*, 4:65–5:2)). This makes little sense when the patent contains a stated definition.

Quectel also ignores the confusing grammatical issues with its proposed construction, mentioned in Philips's opening, including ignoring its confusing proposal that "after" would be read twice into the limitation.

> d.   Quectel's Sur-Reply Position

The intrinsic record squarely supports Quectel's proposed construction. The PTAB adopted (and Philips did not dispute) Quectel's construction for claim 9—identical to asserted claim 13 except for the last limitation. *See* Ex. 12 (IPR2021-00563: Paper 25) at 7-9 (construing "interruption in transmission" as "indicating an event after which a power level is set in order to compensate for the interruption"); Ex. 13 (IPR2021-00563: Paper 6) at 15 ("Patent Owner does not dispute the construction of 'interruption in transmission'"), 32 (Philips applying Quectel's proposed construction), 43-44 (same). After the PTAB held claim 9 unpatentable, Philips now switches gears to a new construction. *See Aylus*, 856 F.3d at 1361. The Court should adopt Quectel's construction, which is directly supported by the intrinsic record.

### 6.   "downlink power control commands"

> a.   Philips's Opening Position

It is unclear why Quectel believes this term needs construction, but its proposed construction does nothing to define the phrase and instead merely adds the words "from the base station" to the claim language. By leaving the entire phrase "downlink power control commands" within the construction, Quectel's proposed construction offers no further guidance to a juror. It is improper.

87

>    b.    Quectel's Answering Position

To narrow the issues in dispute, Quectel adopts Philips's construction of this term.

## V.    '577/'599 PATENTS

### A.    Background

#### 1.    Quectel's Answering Position

Both the '577 and '599 Patents share a common specification and describe a radio communication between a primary station (e.g., base station) and a secondary station (e.g., mobile station), where both stations have one or more antennas for communication. '577 Patent, 2:15-27. The stations communicate over a communication channel that includes paths for data packet transmission. *Id.* The primary station simultaneously sends a plurality of packets, using a subset of the paths, to the secondary station. *Id.* The secondary station receives the packets and determines whether they were correctly received, sending a signal regarding the receipt (e.g., ACK or NACK). *Id.*, 2:15-27, 6:34-37. The only disputed claim term for these two patents at issue here relates to the number of simultaneous data streams the secondary station is "capable of" receiving.

### B.    Disputed Constructions of the '599/'577 Patents

#### 1.    **"number of simultaneous data streams that the secondary station is capable of receiving"/ "a number of simultaneous data streams that the secondary**

88

**station is capable of receiving or processing." ('577 Patent, claim 17; '599 Patent, claim 33)**

      a.      Philips's Opening Position

Quectel's proposed construction attempts to add the word "static" into the claim language, but the plain and ordinary meaning of this term is not limited to a "static" number of simultaneous data streams. The claim language is:

> signal to the primary a **number of simultaneous data streams that the secondary station is capable of receiving;**

('577 Patent, Claim 17.)

> transmit, via the at least one antenna, to the primary station an indication of **a number of simultaneous data streams that the secondary station is capable of receiving or processing.**

('599 Patent, Claim 33.)

Noticeably absent is the term "static." *See Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998) ("it is the *claims*, not the written description, which define the scope of the patent right") (emphasis in original).

The specification does not support adding the word "static" to the claim either. "Static" is also not found in the specification.

Moreover, even if Quectel were to make some argument that there is a part of the specification that mentions the data stream being a "static" number, it is improper to import limitations from the specification into the claims. *See Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1384 (Fed. Cir. 1998).

b.    Quectel's Answering Position

Quectel agrees that the plain and ordinary meaning of this term should apply. The dispute here arose because Philips appears to be asserting infringement in a manner that improperly broadens the plain and ordinary meaning to cover dynamic (changing) channel conditions—contrary to the intrinsic evidence and repeated prosecution disclaimers. Specifically, Philips appears to assert infringement based on the dynamic (changing) status of the **channels** as opposed to the static (fixed) **capability of the secondary station** even though the applicant expressly distinguished these concepts during prosecution and amended the claims to emphasize a fixed, inherent capability. This dispute regarding claim scope requires resolution during claim construction to preclude Philips from recapturing subject matter it clearly disavowed. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

The intrinsic record demonstrates that a "number of simultaneous data streams that the secondary station is capable of receiving [or processing]" refers to a fixed capability of the secondary station. *See Philips*, 415 F.3d at 1315 ("the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it otherwise would be") (quoting *Vitronics,* 90 F.3d at 1582-83).

90

During prosecution, the applicant repeatedly distinguished the number of simultaneous data streams that the secondary station is **capable** of receiving from dynamic channel state information (CSI) regarding the real-time conditions of the data channels (i.e., how many data streams at a specific point in time the secondary station could receive). Philips both: (i) repeatedly argued this distinction and (ii) filed claim amendments to highlight the distinction to overcome prior art rejections.[16]

Philips amended the claims from "can receive or process" to "is capable of receiving or processing" to emphasize that the limitation concerns what the device is built to handle as a matter of design, rather than its performance under varying conditions. *Compare* Nov. 10, 2008 Office Action Resp. at 4 (Ex. 14 at 266), *with* June 7, 2006 Office Action Resp. at 5 (Ex. 14 at 126). Throughout prosecution, Philips consistently, and repeatedly, distinguished the claimed invention's identification of "a number of simultaneous data streams that the secondary station is capable of receiving" over prior art that disclosed dynamic Channel State

---

[16] The '599 Patent is a direct continuation application from the '577 Patent (i.e., it is the "child" application of the '577 Patent) and shares the same substantive written description as the '577 Patent and priority claim. Accordingly, the intrinsic evidence for the '577 Patent applies equally to the '599 Patent. *See, e.g., Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1371 (Fed. Cir. 2014) (prosecution statements "regarding the 'memory' limitation recited in the . . . claims of the [parent] patent apply equally to the 'memory' limitation recited in the . . . claims of the [continuation] patent").

Information (CSI).  *See* June 7, 2006 Office Action Resp. at 8 (Ex. 14 at 129); Dec. 27, 2007 Office Action Resp. at 7 (Ex. 14 at 220); June 6, 2008 Office Action Resp. at 2 (Ex. 14 at 240); Apr. 10, 2009 Office Action Resp. at 7-8 (Ex. 14 at 294-95); Sept. 28, 2009 Office Action Resp. at 6-9 (Ex. 14 at 327-30); Jan. 28, 2010 Appeal Br. at 7-9 (Ex. 14 at 350-52); June 1, 2010 Reply Br. at 5-6 (Ex. 14 at 386-87).

Specifically, Philips argued that CSI, which describes the (real-time or dynamic) condition of a transmission path, is fundamentally different from the **capability** of the secondary station as claimed.  For example, Philips explained that the "state of the transmission channels is **completely different** from the number of simultaneous data streams that the secondary station can receive or process."  Dec. 27, 2007 Office Action Resp. at 7 (Ex. 14 at 220).  Philips repeatedly emphasized this distinction, for example, further asserting "[t]he **condition of the transmission path** between two antennas **provides no information** with regard to the number of simultaneous data streams that the secondary station <u>can</u> receive or process."  June 6, 2008 Office Action Resp. at 2 (underline emphasis original) (Ex. 14 at 240).

The applicant also clarified that the claimed secondary station "capability" is distinct from dynamic channel conditions by arguing that the prior art "fails to provide any teaching regarding the CSI information containing any information

92

regarding an operating condition (i.e., a number of antenna (or paths) that have been determined to not decode received signals correctly)." Oct. 31, 2013 Office Action Resp. at 9-11 (Ex. 14 at 666-68). By distinguishing the claimed "capability" from a dynamic "operating condition," the applicant confirmed the term refers to a static design feature, not the real-time status of device components.

The specification of the '577 and '599 Patents reinforces this interpretation. It explains that the primary station must know the secondary station's ability to process multiple streams as part of a registration process: "It is also important that the number of antennas, or ability to process multiple data streams, at each MS 110 is known to the BS 100. This could be signalled as a part of a registration process … ." '577 Patent, 6:41-45; *see also* '599 Patent, 6:65-7:2. Here, the specification distinguishes between two separate pieces of information: (i) channel quality, which is dynamic, and (ii) the number of streams the station can handle, which is static. *See id.* Further, this passage of the specification illustrates that the secondary station capability can occur during registration, which occurs when the device joins the network, not during ongoing transmissions. The specification disclosure thus confirms that the claimed signaling conveys a static, or fixed, capability of the secondary station, not a fluctuating, dynamic capability that changes based on channel conditions. Nothing in the specification suggests that the claimed number changes based on channel conditions.

93

The claim language itself confirms this reading. Claim 17 recites: "signal to the primary [station] a number of simultaneous data streams that the secondary station is capable of receiving." The phrase "is capable of receiving" denotes an inherent capability of the device, not a real-time condition. This claim limitation recites the **capability** of the secondary station, which is not affected by real-time changes in channel conditions. Other claim elements address dynamic signaling, such as ACK/NACK feedback for retransmissions, demonstrating that the patentee knew how to claim dynamic features when intended. *See, e.g., Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1372 (Fed. Cir. 2004) ("The patentee … could have claimed the regions more broadly but chose to use the word 'polygonal' without modification or qualification. The district court was not free to attribute new meaning to the term or to excuse the patentee from the consequences of its own word choice.").

Any attempt by Philips to construe this term to encompass a dynamic value is contrary to the plain and ordinary meaning of the claim language as informed by the intrinsic record. A dynamic reading would render the applicant's amendments—e.g., to recite what the secondary station "is capable of"—and its repeated distinctions from dynamic CSI meaningless. It would also improperly conflate the claimed "capability" with the separate concept of "channel quality," which the specification treats as distinct. The only reading that gives effect to this

94

evidence is the plain and ordinary meaning: a static number of simultaneous data streams that the secondary station is capable of receiving.

For the above reasons, the Court should adopt Quectel's proposed construction for this term or otherwise indicate that this term does not encompass dynamic channel information.

### c.    Philips's Reply Position

There is no prosecution history disclaimer indicating that the "number of simultaneous data streams that the secondary station is capable of receiving" is static. Prosecution history disclaimer must be both "clear and unmistakable." *Omega Eng'g,* 334 F.3d at 1326. A patentee must "deliberately and unambiguously define its invention" for prosecution history disclaimer to apply. *Id.* at 1325–26. Quectel has not met its burden of demonstrating this.

Quectel concedes that the applicant repeatedly distinguished prior art by arguing that channel state information does not include the number of simultaneous data streams a secondary station can receive. (*Supra*, pp.92–93; *see also, e.g.,* Ex. 14 at 220/972 (12/27/2007 Office Action Resp.), 7; *id.* at 240/972 (6/6/2008 Office Action Resp.), 2.) To reinforce this distinction, the applicant amended the claims, replacing "can receive or process" with "is capable of receiving or processing." (*Id.* at 266/972 (11/10/2008 Office Action Resp.), 4.) This confirms that the number refers to the station's capability, independent of channel conditions.

95

Neither these arguments nor the amendment addressed whether that number is static or dynamic.

The applicant also explained that certain prior art did not teach a specific type of channel state information including information "regarding an operating condition (i.e., a number of antenna (or paths)…." (*Id.* at 667/972 (10/31/2013 Office Action Resp.), 10.) Quectel asserts that "operating condition" is inherently dynamic. (*See supra*, p.93.) But the prosecution history offers little support for that view—only a single example that could be considered dynamic. That isolated reference falls short of a clear and unmistakable disclaimer of all dynamic capabilities.

Further, pointing out what the prior art fails to teach is not enough. *See Comput. Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1375 (Fed. Cir. 2008). Without showing how the application itself differs, such statements cannot amount to a clear and unmistakable disclaimer of dynamic operating conditions. *Id.*

The specification aligns with Philips's proposed construction. Quectel mischaracterizes the specification in arguing that "the primary station **must** know the secondary station's ability to process multiple streams **as part of a registration process**…" (*Supra*, p.93.) Quectel then cites the specification passage that undercuts its own position:

96

> …the number of antennas, or ability to process multiple data streams…known to the BS 100. This **could** be signaled as a part of a registration process…

('577 Patent, 6:41–45.)

The specification states the number *could* be sent during registration—not that it *must* be. Further, Quectel's claimed dynamic/static distinction is unsupported. (*See supra*, p.93.) The specification never characterizes the number of streams as fixed. On the contrary, it acknowledges that capability depends on factors such as processing ability. This attribute can vary with configuration, mode, or available resources. ('577 Patent, 4:17–20, 4:29–32, 6:41–45.) This flexibility indicates dynamism.

Quectel further argues that "[n]othing in the specification suggests that the claimed number changes based on channel conditions." (*Supra*, p.93.) Silence is not disclaimer. *See Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005). Finally, Philips never argued that the number of simultaneous data streams varies with channel conditions. Rather, only that channel conditions are distinct from the number of streams a secondary station can receive. (Ex. 14 at 220/972 (12/27/2007 Office Action Resp.), 7; *id.* at 240/972 (6/6/2008 Office Action Resp.), 2.)

Quectel's reliance on the phrase "is capable of receiving" is misplaced. (*See supra*, 94.) That language does not require a fixed or immutable number. Rather, it

97

describes what the device can handle at a given time. A device's capability can vary based on configuration, mode, or available resources. '577 Patent, 4:17–20, 4:29–32, 6:41–45. Nothing in the claim language excludes such variability.

Finally, Quectel's unsupported identification of "[o]ther claim elements … such as ACK/NACK feedback" (*supra*, p.94) is irrelevant and does not make this limitation static. The patentee did not use words like "fixed" or "unchangeable." The patentee could have required a static number but did not.

Quectel has not met its burden to show a *clear and unmistakable* prosecution history disclaimer.

### d.    Quectel's Sur-Reply Position

To narrow disputes, Quectel proposes a compromise construction of "number of simultaneous data streams that the secondary station is capable of receiving (independent of channel conditions)" / "a number of simultaneous data streams that the secondary station is capable of receiving or processing (independent of channel conditions)."[17]

This revised construction is based on Philips's assertion that the prosecution history "confirms that the number [of simultaneous data streams] refers to the

---

[17] Quectel wrote to Philips on January 16, 2026, proposing the parties agree to this modified construction.  Philips indicated that it currently does not agree to the proposed revised construction, but will take Quectel's proposed compromise under advisement.

station's capability; **independent of channel conditions**." (*See supra*, p. 97); *see also id.* at 96 ("the applicant repeatedly distinguished the prior art by arguing that channel state information does not include the number of simultaneous data streams a secondary station can receive"); *id.* at 98 ("Philips never argued that the number of simultaneous data streams varies with channel conditions").

Quectel raised this issue to preclude a construction that the number of simultaneous data streams varies based on channel conditions (hence Quectel's use of "static" in its original proposed construction). Based on Philips's Reply Brief remarks, however, it appears that the parties agree that the meaning of this claim term requires that the capability of the secondary station be determined "**independent of channel conditions**." Therefore, Quectel proposes this modified construction to resolve the dispute.

## VI.    CONCLUSION

### A.    Philips's Opening Position

For all the foregoing reasons, Philips respectfully requests that its proposed constructions be adopted.

### B.    Quectel's Answering Position

For the reasons explained above, Quectel respectfully requests that the Court adopt Quectel's proposed claim constructions.

YOUNG CONWAY STARGATT & TAYLOR, LLP

/s/ Adam W. Poff
Adam W. Poff (No. 3990)
Robert M. Vrana (No. 5666)
Alexis N. Stombaugh (No. 6702)
1000 N. King Street
Wilmington, DE 19801
(302) 571-6600
apoff@ycst.com
rvrana@ycst.com
astombaugh@ycst.com

OF COUNSEL:

Eley O. Thompson (*pro hac vice*)
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
(312) 832-4359
ethompson@foley.com

Kevin M. Littman (*pro hac vice*)
Lucas I. Silva (*pro hac vice*)
FOLEY & LARDNER LLP
111 Huntington Avenue
Suite 2500
Boston, MA 02199-7610
(617) 342-4000
klittman@foley.com
lsilva@foley.com

Alexis K. Juergens (pro hac vice)
Foley & Lardner LLP
95 S. State Street
Suite 2500
Salt Lake City, UT 84111
ajuergens@foley.com

FISH & RICHARDSON P.C.

/s/ Warren K. Mabey, Jr.
Warren K. Mabey, Jr. (No. 5775)
Martina Tyreus Hufnal (No. 4771)
222 Delaware Avenue, 17th Floor
Wilmington, DE 19899
Tel: (302) 652-5070
Fax: (302) 652-0607
mabey@fr.com
hufnal@fr.com

Thomas H. Reger II (pro hac vice)
Fish & Richardson P.C.
1717 Main Street, Suite 5000
Dallas, Texas 75201
(214) 747-5070 (Telephone)
(214) 747-2091 (Facsimile)
reger@fr.com

Lawrence R. Jarvis (pro hac vice)
Katherine Reardon (pro hac vice)
Fish & Richardson P.C.
1180 Peachtree Street NE
21st floor
Atlanta, GA 30309
(404) 892-5005
jarvis@fr.com
reardon@fr.com

Elizabeth G.H. Ranks (pro hac vice)
Fish & Richardson P.C.
One Marina Park Drive
Suite 1700
Boston, MA 02210
617-368-2175
ranks@fr.com

Bryan J. Cannon (pro hac vice)

100

*Attorneys for Plaintiff Koninklijke Philips N.V.*

Fish & Richardson P.C.
1000 Maine Avenue SW
Suite 1000
Washington, DC 20024
(202) 220-6859
cannon@fr.com

*Attorneys for Defendant Quectel Wireless Solutions Co. Ltd.*

101